STATE OF NORTH CAROLINA v. AUDWIN BRENT JACKSON

No. 1

(Filed 7 March 1977)

1. **Criminal Law § 76— motion to suppress evidence — voir dire hearing — findings of fact**

Upon a motion to suppress evidence, the proper procedure is for the judge, in the absence of the jury, to hear the evidence and make findings of fact upon which the admissibility of the allegedly incompetent evidence depends, and his findings of fact, if supported by competent evidence, are conclusive on appeal.

2. **Criminal Law § 76— admissibility of in-custody statements — sufficiency of evidence to support findings**

The evidence on *voir dire* supported findings by the trial court that defendant was not coerced into making in-custody statements, was not harassed or abused, and was fully advised of his constitutional rights, that any statements he may have made were made at a time when his physical and mental faculties were unimpaired, and that such statements were made freely, voluntarily and understandingly.

APPEAL by defendant from *McKinnon, J.,* at the January 1976 Criminal Session of WAKE.

Upon an indictment, proper in form, the defendant was tried for the murder of Kirk Dugger Jones. He was found guilty of murder in the first degree and the record shows that he was sentenced to death, but it appears both from the brief of the defendant and the brief of the State that, following the decision of the Supreme Court of the United States in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976), that sentence was vacated and a sentence to imprisonment for life was substituted therefor.

The record on appeal does not show any of the evidence introduced before the jury, nor does it contain any part of the instructions of the trial judge to the jury.

The defendant was represented at his trial, and at the pretrial hearing of his motion to suppress certain evidence, by counsel employed by his mother. Upon appeal he was represented by the same counsel, pursuant to appointment by the court.

There are only two assignments of error, both of which relate to the denial of his pretrial motion to suppress evidence,

this motion being heard before and denied by Bailey, J. These assignments of error are as follows:

"1. The Court erred in making the following findings of fact * * * as the same finds [sic] no support in the evidence:

'However, the Court finds as a fact that the defendant, Jackson, was not * * * coerced into making any statement of any sort, was in no ways [sic] harassed or abused, that he was fully warned of his constitutional rights, and to the extent he made any statement, that he made the statement at a time when his physical and mental faculties were unimpaired and that such statements were freely, voluntarily and understandingly made * * *.'

"The Court erred in admitting into evidence inculpatory statements said to have been made by the defendant to the investigating police officers of Raleigh; to Mr. De-Soto, representative for McDonald's; to Mr. Crumpler, Assistant District Attorney, for the reasons: they were made after refusal to allow him to consult with counsel; were obtained by trickery, artifice and fraud and were coerced and involuntary, all in violation of his rights as provided by the Due Process Clause of the 14th Amendment to the Constitution of the United States, and Article I, Section 19, of the Constitution of the State of North Carolina."

The only evidence set forth in the record on appeal is that offered before Bailey, J., upon the defendant's motion to suppress. From this it appears that the manager of a McDonald's Restaurant in Raleigh was shot and killed in the course of a hold-up as he was preparing to close the restaurant on 17 May 1975. Acting upon information received, police officers discovered near the restaurant, hidden under a quantity of straw, a pistol and a bag containing rolls of coins apparently taken from the restaurant. The officers maintained surveillance over this area and some time later the defendant and a female companion drove up and were observed to approach the pile of straw and to begin to dig into it. They were thereupon arrested. Officers searching the home of the defendant's mother, with whom he lived, the search being with her consent, found therein a box of pistol bullets of the same caliber as the pistol found under the straw. At the time of his arrest, the defendant was

State v. Jackson

16 years of age and lived with his mother in a part of the City of Raleigh which was a substantial distance from the place where the pistol and money were found. When arrested, he told the officers that his purpose in coming to that place was to get some straw. While in custody, the defendant made to Mr. Crumpler, Assistant District Attorney, and to Mr. DeSoto, Security Officer for the McDonald Restaurant chain, statements to the effect that he and a companion went to the restaurant for the purpose of robbing it, the companion having a pistol for which the defendant supplied bullets and, during the course of the robbery, the companion shot and killed the manager of the restaurant. Presumably, evidence of these oral statements by the defendant was introduced before the jury, Judge Bailey having denied the pretrial motion to suppress.

At the hearing upon his motion to suppress, the defendant testified to the following effect:

Following his arrest he was handcuffed, carried to the police station, fingerprinted and interrogated by police officers. He requested permission to use the telephone but there was no response to his request. Because the defendant did not cooperate with the officer taking his fingerprints, that officer mashed his hand "too hard," telling him he was not there to play, another struck him on the head with a pair of handcuffs and they cursed and threatened him, telling him he would have to let them take his fingerprints to prove his innocence. When the defendant's mother came to the jail, he did not tell her about being struck because he did not want to "upset her." He kept stating to the officers that he was innocent. The officers were armed and he was afraid he was going to be beaten. He signed a waiver of his right to counsel and an acknowledgment that he had been advised of his constitutional rights without reading it.

To all of the officers' interrogations the defendant replied, "I don't have no comment about nothing; I don't have nothing to say." The officers told him they knew he had killed the murder victim because they had his partner, and the girl who was with him at the time of his arrest had signed a statement to the effect that they were there to pick up some money. They also told him that if he did not say anything about it, that would be used against him in court. Nevertheless, the defendant testified: "I never made any statement to Mr. Brinson [the

investigating officer] involving myself in the crime. I never told Mr. DeSoto [the security officer for the McDonald Restaurant chain] that I committed this crime. After talking to Officer Brinson, I didn't talk to anyone."

Mr. DeSoto offered the defendant coffee, a Coca-Cola and cigarettes but the defendant said he did not want anything. Again, the defendant testified, "I never made a statement to Mr. DeSoto that I was involved in this thing." Mr. DeSoto told him they knew the defendant "did it," so the defendant "might as well admit to it and tell who pulled the trigger" and the District Attorney could "take it out easy" on the defendant.

After Mr. DeSoto left the room, Mr. Crumpler, the Assistant District Attorney, came in. The defendant said to him, "I don't have no comment about the crime, I don't know anything about it." Mr. Crumpler said he was going to hang the defendant but the defendant replied, "I don't have no comments." Again, the defendant testified, "I made no comments of any sort either to Mr. DeSoto or Mr. Crumpler."

The defendant told Mr. Crumpler he wanted to see his lawyer. Mr. Crumpler, in reply, told the defendant that his mother was "out there" and asked if he wanted to see her. The defendant replied, "That would be all right but I want to see my lawyer too." The defendant continued to refuse to make any comment about the alleged crime and Mr. Crumpler said he was going to prosecute the case and was going to try his best to send the defendant to death row. Nevertheless, the defendant "didn't say anything about the crime."

At the hearing of the motion to suppress, the State's evidence was to the following effect:

Detective Sergeant Williams of the Raleigh Police Department testified:

He talked to the defendant while he was in custody. First, he advised the defendant of his constitutional rights, reading to him and giving him a written statement of these (as set forth in *Miranda v. Arizona*, 384 U.S. 436), which the defendant read and a waiver of which he also read and signed. Thereafter, Mr. Williams asked the defendant concerning his connection with the robbery and murder and the defendant denied any knowledge of these. The defendant did not complain to Mr. Williams, the superior of the other officers conducting the investigation,

State v. Jackson

of being struck on the head with handcuffs. The defendant appeared to be sober, not affected by any drug, intelligent and in full possession of his faculties.

Detective Brinson of the Raleigh Police Department, the principal investigator in the case, testified:

The defendant was not handcuffed while Detective Brinson talked with him. Detective Brinson was armed and the other officers assisting him were probably armed also. He was present when the defendant signed the waiver of his constitutional rights, which waiver Mr. Brinson read to him. No one threatened him or told him he had to sign it. The defendant was coherent, neat and clean and normal in appearance. Prior to talking to him, Mr. Brinson had received information through a confidential informer that the defendant was a participant in the robbery of the restaurant and had actually done the killing. At no time did the defendant request to leave the interrogation room, to use the telephone, to stop the interrogation, to get an attorney, to call or see his mother or to be given anything to eat or drink. At no time did Mr. Brinson make any promise or threat to the defendant, or strike him with handcuffs or otherwise. The defendant made no incriminating statement to Mr. Brinson.

Mr. Richard DeSoto, Security Officer for the McDonald's Restaurant chain, testified:

With the permission of the investigating police officers, but not at their request, he talked to the defendant, they being alone in the interrogation room. He informed the defendant that he was connected with the McDonald Corporation and had been sent to Raleigh to assist the police in the investigation of the murder. He did not tell him it would be better for him to cooperate with the police and the District Attorney. He offered the defendant coffee and a Coca-Cola, which the defendant declined.

He informed the defendant that an Assistant District Attorney (Mr. Crumpler) was present in the police station and advised the defendant to talk to him if the defendant "had any facts in the case that would help him." He told the defendant that if the defendant was not the person who had pulled the trigger, he might wish to tell that to the District Attorney. The defendant then asked Mr. DeSoto what the word "accessory"

meant and Mr. DeSoto advised him that an accessory would probably be charged "the same as the person that pulled the trigger." Mr. DeSoto never told the defendant that the District Attorney would "make a deal with him." He told the defendant that the District Attorney "would abide by whatever word he said * * * and if he said he would use anything against him it would be that way also."

In response to Mr. DeSoto's inquiry, the defendant stated that his companion pulled the trigger and that when the defendant last saw the manager of the restaurant, the manager was "lying on the floor in the back of the store," the defendant being "outside the doorway." The defendant said that his companion had shot the manager so as "to leave no witnesses." He refused to identify his companion.

Mr. DeSoto promised the defendant absolutely nothing. He did not threaten the defendant and never touched him. The defendant was not handcuffed and Mr. DeSoto was not armed. The defendant did not appear to be under the influence of alcohol or drugs and indicated that he felt all right and had never used drugs. He was coherent, asked intelligent questions and appeared to be in control of his mental and physical faculties.

The defendant seemed to be very knowledgeable as to what he was doing and to be taking care of himself very well. He did not request Mr. DeSoto to call a lawyer or request that he be permitted to use the telephone. He showed no sign whatever of having been abused and made no comment whatever with reference to any abuse.

Assistant District Attorney Crumpler testified:

Having been advised that the defendant wanted to talk to him, he talked with the defendant, identifying himself as an Assistant District Attorney. He was alone with the defendant in the interrogation room. He told the defendant to disregard anything that anybody else might have told him about benefits that he might gain from talking to Mr. Crumpler. He further told the defendant no promises could be made to him except by Mr. Crumpler and that he was not about to make him any promises. Mr. Crumpler then "took out a waiver form" and advised the defendant "of his constitutional rights," reading those rights to him and asking him if he understood each one, in some

State v. Jackson

instances explaining the right. The defendant stated that he understood each of those rights and that he did not want to have an attorney present while Mr. Crumpler was talking to him. At no time did Mr. Crumpler raise his voice to the defendant, speak harshly to him, abuse him, threaten him or make him any promises.

After the defendant made a statement to Mr. Crumpler, the defendant asked some questions about "plea bargaining," which Mr. Crumpler answered. At no time did Mr. Crumpler tell the defendant that he would enter into any plea bargaining arrangement with the defendant. On the contrary, he told the defendant that "at this particular point" he was not going to do any dealing of any kind whatsoever.

The defendant did not appear to be under the influence of drugs or liquor. He seemed normal physically, complained of no injuries or mistreatment, spoke in an intelligent manner and was coherent and unemotional. He seemed to Mr. Crumpler "to be self-assured, almost to the point of being cocky." He seemed "to know exactly what he was doing, quite confident of himself," and impressed Mr. Crumpler as being much more mature than a 16 year old, which Mr. Crumpler knew him to be. He never said anything to Mr. Crumpler about wishing to make a telephone call or to have a lawyer present. Mr. Crumpler advised him that he could have a lawyer, his mother or anyone else with him during the questioning and advised him that any statement he made could be used against him in court.

The defendant told Mr. Crumpler that he and his companion went to McDonald's for the purpose of robbing it, that the other man shot the manager and the defendant was surprised at the shooting, though he had furnished the bullets for the gun, which was a .38 caliber revolver, and had handled the gun so that his fingerprints might be on it.

*Rufus L. Edmisten, Attorney General, by Ben G. Irons II, Associate Attorney, for the State.*

*Charles V. Bell for defendant.*

LAKE, Justice.

[1, 2] It is well settled that, upon a motion to suppress evidence, the proper procedure is for the judge, in the absence of the jury, to hear the evidence and make findings of fact upon

which the admissibility of the allegedly incompetent evidence depends. His findings of fact, if supported by competent evidence, are conclusive on appeal. *State v. Thompson,* 287 N.C. 303, 214 S.E. 2d 742 (1975); *State v. Pruitt,* 286 N.C. 442, 212 S.E. 2d 92 (1975); *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1, cert. den., 386 U.S. 911 (1967); *State v. Hines,* 266 N.C. 1, 145 S.E. 2d 363 (1965). Quite obviously, the findings of fact made by Judge Bailey, which the defendant assigns as error, were amply supported by competent evidence. There is, therefore, no merit in this assignment of error.

The record on appeal does not indicate whether the defendant testified before the jury in his own behalf or, if so, whether he then adhered to his denial that he made the incriminating statements attributed to him by Mr. DeSoto and Mr. Crumpler. If he did so testify before the jury, this conflict between his testimony and that of the witnesses for the State, assuming that they testified before the jury as to the making of such statements by the defendant, simply raised a question of fact for the jury which determined that matter in favor of the State.

The findings of fact made by Judge Bailey concerning the voluntary nature of the statements made by the defendant to Mr. DeSoto and Mr. Crumpler being conclusive upon appeal, there was no error in admitting the inculpatory statements by the defendant into evidence before the jury, assuming that they were so admitted. Consequently, there is no merit in the defendant's second assignment of error.

No error.