STATE OF NORTH CAROLINA v. FREDDIE LEE STOKES

No. 448A82

(Filed 7 July 1983)

### 1. Courts § 9.1; Jury § 6— individual voir dire of jurors—discretion of trial judge—effect of prior order by another judge

The trial judge in a first degree murder case was not bound by a pretrial order entered by another judge which provided for individual voir dire of the prospective jurors since (1) the rule that one judge may not review orders, judgments or actions of another judge of coordinate jurisdiction does not apply to interlocutory orders given during the progress of an action which affect the procedure and conduct of the trial, and (2) the judge who actually tried the case was given the discretionary power by G.S. 15A-1214(j) to determine whether jurors should be selected one at a time.

### 2. Jury § 6— denial of motion for individual voir dire and to sequester jury

The trial court did not abuse its discretion in denying defendant's motion for individual voir dire in jury selection, to sequester the jury venire during voir dire proceedings, and to sequester the trial jury after selection was completed because of pretrial publicity concerning defendant's case where defendant failed to produce any evidence tending to show the existence of inflammatory, nonfactual reporting by the news media or that any seated juror was affected by pretrial publicity. Nor did the denial of such motion constitute prejudicial error because it permitted jurors to be "educated" by other jurors' answers to questions posed on the voir dire so as to enable them to escape jury service.

### 3. Constitutional Law § 31— indigent defendant—refusal to appoint expert in psychology

The trial court did not abuse its discretion in the denial of an indigent defendant's motion that he be permitted, at State expense, to retain an expert in psychology experienced in jury selection in criminal cases where defendant failed to show that the denial of his motion deprived him of a fair trial or that he would have been materially assisted in the preparation of his defense had the motion been granted. G.S. 7A-450(b).

**4. Criminal Law § 75.3— confession—effect of confronting defendant with statements of others**

Confronting an accused with statements of his codefendants which implicate him in a crime does not, standing alone, render an ensuing confession involuntary.

**5. Criminal Law § 75.2— confession not coerced by threats of gas chamber**

The evidence supported the trial court's determination that defendant was not coerced into confessing by threats that he would go to the gas chamber unless he admitted his participation in the crimes charged.

**6. Criminal Law § 75.14— confession—subnormal mentality**

A subnormal mental condition standing alone will not render an otherwise voluntary confession inadmissible.

**7. Homicide § 21.6; Larceny § 7— murder in perpetration of felony—larceny—sufficiency of evidence**

The State's evidence was sufficient to support defendant's conviction of larceny and first degree murder committed in the perpetration of armed robbery where it tended to show that defendant clubbed the victim to the ground and took his automobile and other property; there was medical evidence that the victim died as a result of blows to the head from a blunt instrument; and there was further evidence that defendant was seen in the victim's stolen automobile shortly after the killing took place and articles taken from the victim were found in defendant's possession.

**8. Criminal Law § 135.4; Homicide § 31.1— felony murder—instructions on when death penalty may be imposed**

Where the evidence in a felony murder case was conflicting as to whether defendant himself robbed the victim and delivered the fatal blows or whether defendant participated in the crime only as a lookout, the trial court correctly instructed the jury that defendant could be found guilty of felony murder under the theory that defendant was the actual perpetrator of the crime and struck the fatal blows or under the theory that, although not the actual perpetrator, he was present and aided and abetted in the commission of the robbery and the resultant felony murder actually committed by another, and the jury's verdict was guilty of first degree murder without an indication as to the theory upon which defendant was convicted, the trial court erred in failing to instruct the jurors during the penalty phase of the trial that, in order to impose the death penalty, they would have to find that defendant killed, attempted to kill or intended or contemplated that the victim would be killed.

**9. Criminal Law § 135.4— first degree murder—submission of mitigating circumstances**

The burden of persuading the jury as to the existence of any mitigating circumstance is upon the defendant to so prove by a preponderance of the evidence, and when all the evidence tends to show the existence of a particular mitigating circumstance, a defendant is entitled to a peremptory instruction on that issue. Even when a defendant offers no evidence to support the existence of a mitigating circumstance, the mitigating circumstance must be submitted

when the State offers or elicits evidence from which a jury could reasonably infer that the circumstance exists.

**10. Criminal Law § 135.4— first degree murder—no significant history of prior criminal activity—failure to submit as mitigating circumstance**

The trial court in a capital case did not err in refusing, upon defendant's request, to submit as a mitigating circumstance that defendant had no significant history of prior criminal activity where the State, upon cross-examination of defendant, elicited evidence of numerous past criminal activities. G.S. 15A-2000(f)(1).

**11. Criminal Law § 135.4— first degree murder—mental or emotional disturbance mitigating circumstance—error in failure to submit**

The trial court erred in failing to submit to the sentencing jury in a first degree murder case the mitigating factor as to whether defendant was under the influence of a mental or emotional disturbance at the time the crime was committed where there was lay testimony that defendant had a long history of treatment for mental problems which began when he was 10 years old, and a psychiatrist testified that defendant was mildly mentally retarded and had an antisocial personality disorder. G.S. 15A-2000(f)(2).

**12. Criminal Law § 135.4— first degree murder—impaired capacity mitigating circumstance—error in failure to submit**

The trial court erred in failing to submit to the sentencing jury in a first degree murder case the mitigating circumstance as to whether defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired where there was lay testimony that defendant had a long history of treatment for mental problems which began when he was 10 years old, and a psychiatrist testified that she had examined defendant after the commission of the charged crime and that defendant was mildly retarded and had an antisocial personality disorder. G.S. 15A-2000(f)(6).

**13. Criminal Law § 135.4— first degree murder—accomplice or accessory mitigating circumstance—error in failure to submit**

The trial court erred in failing to submit to the sentencing jury in a first degree murder case the mitigating circumstance as to whether defendant was an accomplice in or an accessory to the capital felony committed by another person and whether his participation was relatively minor where the State presented evidence that defendant actually delivered the blows which caused the victim's death, and the State further offered a purported confession which tended to show that defendant was only a lookout and did not deliver the fatal blows. G.S. 15A-2000(f)(4).

**14. Criminal Law § 135.4— first degree murder—insufficient evidence to support certain mitigating circumstances**

The evidence was insufficient to require the trial court to submit to the sentencing jury in a first degree murder prosecution mitigating circumstances as to whether defendant was subjected in his formative years to cruelty and physical abuse by his parents and as to whether defendant in his formative years was subjected to mental abuse by his parents.

**15. Criminal Law § 135.4— first degree murder—mitigating circumstance—no relationship with natural father—insufficient evidence**

The evidence did not require the trial court to submit to the sentencing jury in a first degree murder case the mitigating circumstance as to whether defendant was an illegitimate child who never experienced a relationship with his natural father where the evidence showed that defendant was an illegitimate child; a marriage was never consummated between defendant's mother and his natural father, but the father lived with the mother "off and on" in the past; defendant's older sister had the responsibility of rearing defendant since his mother was often away working to help support the family; defendant's father left the household when defendant was about five or six years old; at about that time, defendant was in an accident and sustained a serious injury to his leg; on occasion, defendant's father would come to the home to see how he was progressing; and although the father was not in the home, defendant's mother would call him and tell him that defendant "had to go to the hospital or something like that and he could come out there."

APPEAL by defendant from *Stevens, Judge,* at 18 May 1982 Criminal Session of NEW HANOVER Superior Court.

Defendant, Freddie Lee Stokes, was charged with first-degree murder, armed robbery of Kuano Lehto, and felonious larceny of Kuano Lehto's automobile. He entered a plea of not guilty to each charge.

The State's evidence tended to show that on 28 December 1981, Kuano A. Lehto was president and owner of the Wilmington Bonded Warehouse in Wilmington, North Carolina. Mr. Lehto worked at the warehouse until around 6:00 or 6:05 in the evening. As he left the warehouse Mr. Lehto was attacked by two men. He was hit several times about his head with a wooden club-like stick. His assailants took at least $200 in cash, credit cards, a money clip, and his 1973 blue Chevrolet automobile. He was left lying on a ramp leading to the warehouse office door.

Around 6:30 p.m., Mr. Lehto's wife called the warehouse but received no answer. She called Mr. Leslie Boney, Jr., at about 8:15 and, pursuant to this conversation, Mr. Boney and his son, Leslie Boney, III, drove to the warehouse where they found Mr. Lehto lying in a pool of blood on the warehouse ramp. He had two large gashes on his head and his skull was so crushed that a portion of his brain was visible. Blood was gushing from his mouth as he tried unsuccessfully to arise on three occasions.

An ambulance was summoned and Mr. Lehto was taken to the New Hanover Memorial Hospital where he was treated by Dr. Robert Moore, a neurosurgeon.

Dr. Moore testified at trial that Mr. Lehto's skull was fractured in several places and that the bones over one eye and at the base of the brain were shattered. Mr. Lehto died about ten hours after he was admitted to the hospital.

Dr. Ralph McKoy, a pathologist at the hospital, testified that he performed an autopsy on the victim and that Mr. Lehto died as a result of multiple blows to the head.

Lorenzo Thomas, testifying for the State, stated that in the early evening of 28 December 1981, he went to a basketball court in the Houston-Moore housing project where he met defendant, Ricky Benbow and James "Jimmy Jew" Murray. Benbow told Thomas that he, Murray and defendant were going to the warehouse to rob the "old man." He asked Thomas to act as a lookout and Thomas agreed.

As they proceeded toward the warehouse, defendant was carrying a wooden stick in his hand. The stick was approximately 18 inches long and about two and one-half inches wide. Benbow told Thomas to stop as they neared the warehouse and to whistle if he saw anyone coming. Thomas further testified that after standing out of sight of the warehouse for about five minutes he walked up the street where he could see the warehouse. At that time, he observed Benbow at the bottom of the ramp. Murray and defendant each held a stick in their hands and were bent over. Thomas testified that they appeared to be in a struggle. Shortly thereafter, defendant, Murray and Benbow left in Mr. Lehto's car with defendant driving. They did not stop for him so he walked back to the housing project. Thomas stated that defendant gave him a bag of marijuana for acting as a lookout at the scene of the crime.

A corroborative statement made by Thomas to the police officers prior to trial was read into evidence.

Gloria Robinson testified that she had formerly been defendant's girlfriend and that on 28 December 1981, at about 7:00 p.m., she saw defendant driving a blue Chevrolet automobile. She had never known defendant to own an automobile. Upon being shown photographs of Mr. Lehto's car, she stated that the vehicle

depicted in the photographs looked like the car defendant was driving that night. She further testified that on 31 December 1981, she saw defendant at a local club and at that time he had a wallet containing fifty and twenty dollar bills. She was then shown State's exhibit 2 and identified it as the wallet she saw in defendant's possession on 31 December. State's exhibit 2 was a wallet which was taken from defendant when he was arrested and thereafter identified at trial as looking exactly like a wallet belonging to Mr. Lehto.

The State also introduced into evidence a statement made by defendant while he was in police custody. The essence of this statement was that defendant acted as a lookout while Benbow and Thomas went to the warehouse, and that Thomas was the person who actually hit Mr. Lehto. Defendant stated that he then joined Benbow and Thomas in the parking lot of the warehouse where Thomas gave him $150, a wallet, and the keys to Mr. Lehto's automobile. Defendant drove Mr. Lehto's automobile to the home of Gloria Robinson, his girlfriend, but she was not at home. He then drove the car to Martin Street and parked it.

The statement of Ricky Benbow was also read into evidence. According to this statement, Benbow was at the apartment where defendant lived on 28 December 1981. He and defendant left the apartment and walked to Thirteenth Street. Defendant told Benbow that he was going to "hit the old man up on the hill" and that the man "had a lot of money on him." Shortly thereafter, defendant and Benbow were joined by Thomas and Murray and they discussed "hitting the man at the warehouse." As they neared the warehouse, Thomas and Benbow remained across the street while defendant and Murray went to a door located at the end of a warehouse ramp. When Mr. Lehto came out of the warehouse, defendant hit him in the face. At that point, Benbow ran back to defendant's apartment. Defendant later came home and scolded Benbow for leaving the scene. He showed Benbow some bills, including fifties, twenties, and tens, and told him that they had taken Mr. Lehto's car. Later that evening as defendant, Benbow, Terry Green, and some members of defendant's family were walking up Thirteenth Street, defendant showed them where he had parked the Lehto automobile.

Defendant took the stand and testified that he did not participate in the killing of Mr. Lehto. He stated that the statement

he gave to the police was a lie and that he gave the statement because he was frightened and was threatened with the death penalty by the police officers. According to defendant, on 28 December 1981, he went to a nearby mall in the afternoon and bought some towels for his mother. He then stopped by a friend's house at about 6:00 and returned to his apartment about 30 minutes later.

Defendant's mother testified that she had been asleep most of the afternoon of 28 December 1981 and after she wakened, she went to visit Yvonne Nixon who lived in a nearby apartment. When she arrived there, the evening news was on the television. Defendant and Ricky Benbow came by the Nixon apartment while she was there and stayed for about ten minutes. The evening news was still in progress when they left. Shortly thereafter, she returned to her own apartment and defendant came home within an hour. Between 8:00 and 9:00 p.m. defendant, members of his family and some friends went to a local nightspot known as Kerosene City and remained there until sometime after midnight.

Defendant presented other witnesses whose testimony tended to corroborate his mother's testimony.

The jury returned verdicts of guilty of first-degree murder, armed robbery, and felonious larceny. The court arrested judgment on the armed robbery conviction because defendant was found guilty of felony murder and this was the underlying felony.

A sentencing hearing was held to determine whether defendant would receive life imprisonment or the death penalty for the felony murder conviction.

At the sentencing hearing the State presented the testimony of only one witness and relied principally on the evidence presented at the guilt-innocence phase of the trial. Defendant presented the testimony of his mother and sister and read into evidence a report prepared by Dr. Mary M. Rood, a forensic psychiatrist at Dorothea Dix Hospital in Raleigh, North Carolina. Further evidence pertinent to this hearing will be set forth in the opinion.

The trial court submitted two aggravating circumstances to the jury, to wit: (1) was the murder committed for pecuniary gain, and (2) was the murder especially heinous, atrocious or cruel. The

jury found both of these aggravating circumstances to exist beyond a reasonable doubt. The jury also found beyond a reasonable doubt that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty.

The trial judge submitted eight mitigating circumstances and instructed the jury that it could consider any other circumstance or circumstances arising from the evidence which it deemed to have mitigating value. The jury found that one or more mitigating circumstances existed, but did not indicate which mitigating circumstances were found.

The jury found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances and recommended that defendant be sentenced to death. The trial judge sentenced defendant to death for the felony murder of Kuano Lehto and to imprisonment for a period of ten years for felonious larceny. Defendant appealed the death sentence directly to this Court as a matter of right pursuant to G.S. 7A-27(a). On 15 December 1982, we allowed defendant's motion to bypass the Court of Appeals on the felonious larceny conviction pursuant to G.S. 7A-31(a).

*Rufus L. Edmisten, Attorney General, by Joan H. Byers, Assistant Attorney General, for the State.*

*Arnold Smith for defendant-appellant.*

BRANCH, Chief Justice.

I

### Guilt-Innocence Phase

Defendant assigns as error the trial judge's denial of his motion to permit individual *voir dire* of the jury venire, to sequester the jury venire during the *voir dire* proceedings, and to sequester the trial jury after selection was completed. This motion was apparently addressed to the trial judge after the jury selection process had been underway for one day.

[1]   In support of this assignment of error, defendant first takes the position that the trial judge was bound by a pretrial order entered by Judge Llewellyn, which provided for individual *voir dire* of the prospective jurors.

The general rule in this jurisdiction is that ordinarily a trial judge may not review the orders, judgments, or actions of another judge of coordinate jurisdiction. In such cases, a defendant's remedy is to perfect his appeal to the appellate division. *Thornburg v. Lancaster*, 303 N.C. 89, 277 S.E. 2d 423 (1981); *State v. McClure*, 280 N.C. 288, 185 S.E. 2d 693 (1972); *Price v. Ins. Co.*, 201 N.C. 376, 160 S.E. 367 (1931). To permit one superior court judge to overrule the final order or judgment of another would result in the disruption of the orderly process of a trial and the usurpation of the reviewing function of appellate courts. *State v. Duvall*, 304 N.C. 557, 284 S.E. 2d 495 (1981).

This rule does not apply, however, to *interlocutory* orders given during the progress of an action which affect the procedure and conduct of the trial. *Carr v. Carbon Corp.*, 49 N.C. App. 631, 272 S.E. 2d 374 (1980), *disc. review denied*, 302 N.C. 217, 276 S.E. 2d 914 (1981); *see also Calloway v. Motor Co.*, 281 N.C. 496, 189 S.E. 2d 484 (1972). An interlocutory order or judgment does not determine the issues in the cause but directs further proceedings preliminary to the final decree. *Carr v. Carbon Corp., supra; In re Blalock*, 233 N.C. 493, 64 S.E. 2d 848 (1951). Such order or judgment is subject to change during the pendency of the action to meet the exigencies of the case. *Skidmore v. Austin*, 261 N.C. 713, 136 S.E. 2d 99 (1964).

In *Oxendine v. Dept. of Social Services*, 303 N.C. 699, 281 S.E. 2d 370 (1981), we recently held that a pretrial ruling by a superior court judge consolidating claims for trial was not binding on the superior court judge who tried the case. We note that a motion for individual jury selection and jury segregation are matters addressed to the *trial* judge's discretion. *State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183 (1981); *State v. Taylor*, 298 N.C. 405, 259 S.E. 2d 502 (1979). G.S. 15A-1214(j), in part, provides:

> In capital cases the *trial* judge for good cause shown *may* direct that jurors be selected one at a time, . . . (emphasis added).

We interpret the above-quoted statute as placing this discretionary power in the trial judge who actually tries the case. Judge Stevens, who denied defendant's motion, was the judge who actually tried the case and, accordingly, the motion for individual jury selection and jury sequestration was directed to *his*

discretion. His exercise of discretion will not be disturbed absent a showing of an abuse of discretion. *State v. Oliver, supra.*

[2] We find no merit in defendant's argument that his motion should have been allowed because of pretrial publicity concerning this "sensitive" case. Defendant completely failed to produce any evidence tending to show the existence of inflammatory, non-factual reporting by the news media or that any seated juror was affected by pretrial publicity. Neither is there substance in his contention that the denial of his motion constituted prejudicial error because it permitted jurors to be "educated" by other jurors' answers to questions posed on the *voir dire* so as to enable them to escape jury service. We have rejected similar arguments in *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed. 2d 1137, *reh. denied,* 448 U.S. 918, 101 S.Ct. 41, 65 L.Ed. 2d 1181 (1980); and *State v. Oliver, supra,* as being speculative and unpersuasive. We elect to follow the holdings of these recent cases.

We hold that defendant has failed to show that Judge Stevens abused his discretion in denying the motion for individual *voir dire* in jury selection, to sequester the jury venire during *voir dire* proceedings, and to sequester the trial jury after selection was completed.

[3] Defendant assigns as error the denial of his motion that he be permitted, at State expense, to retain an expert in psychology experienced in jury selection in criminal cases. He relies upon the arguments in the preceding assignments of error to support this contention. The relevance of these arguments to the assignment here considered is nebulous and of no force in view of our disposition of the contentions in the previous assignment of error.

Although not relied upon or brought to our attention by defendant's brief, we believe that the disposition of this assignment of error turns upon the provisions of G.S. 7A-450(b) and our interpretation of that statute. This statute provides:

Whenever a person, under the standards and procedures set out in this Subchapter, is determined to be an indigent person entitled to counsel, it is the responsibility of the State to provide him with counsel and the other necessary expenses of representation. The professional relationship of counsel so

provided to the indigent person he represents is the same as if counsel had been privately retained by the indigent person.

It is well established by our decisions that in order for an indigent defendant to be furnished an expert witness at State expense, the defendant must make a showing that there is a reasonable likelihood that he will be materially assisted in the preparation of his defense or that without the expert's services it is probable that the defendant will not receive a fair trial. *State v. Williams,* 305 N.C. 656, 292 S.E. 2d 243, *cert. denied,* --- U.S. ---, 103 S.Ct. 474, 74 L.Ed. 2d 622 (1982), *reh. denied,* --- U.S. ---, 103 S.Ct. 839, 74 L.Ed. 2d 1031 (1983); *State v. Gray,* 292 N.C. 270, 233 S.E. 2d 905 (1977); *State v. Tatum,* 291 N.C. 73, 229 S.E. 2d 562 (1976). The appointment of an expert for an indigent defendant is a matter addressed to the trial judge's discretion and such appointment should be made with caution. *State v. Tatum, supra.*

Defendant has not shown that the failure of the trial judge to grant his motion deprived him of a fair trial or that he would have been materially assisted in the preparation of his defense had the motion been granted. To the contrary, this record shows that defense counsel diligently and adequately explored the question of whether each juror seated could give defendant an impartial and fair trial.

We hold that defendant has failed to show any abuse of discretion on the part of the trial judge. Accordingly, this assignment of error is overruled.

Defendant next assigns as error the denial of his motion to suppress a written inculpatory statement made by him to police officers.

At the hearing held pursuant to defendant's motion to suppress, the State offered evidence tending to show that defendant was questioned by police officers at the law enforcement center on 28 January 1982. He was advised of his rights, stated that he understood them and at that time signed a written waiver, including a waiver of the right to counsel. He was specifically asked if he wanted a lawyer and replied in the negative. Defendant stated that he had completed the tenth grade and, upon request, read to the officers from a *Miranda* form. The officers testified

that there was no physical abuse, threats or promises made to defendant and specifically denied making any statements to defendant concerning the death penalty. Defendant originally made an oral statement which was reduced to writing. Defendant read the statement and signed it. He then stated that he felt better and that he had a lot off his mind.

On cross-examination it was established that before defendant made the inculpatory statement, he was shown statements implicating him in the crimes under investigation and was told that he had been seen driving the victim's automobile shortly after the crime occurred.

Defendant offered evidence tending to show that the police officers told him that he was going to get the gas chamber unless he admitted his participation in the crimes under investigation.

At the conclusion of the hearing, the trial judge found and concluded in relevant part the following:

> . . . that the Court further finds that the defendant—at the time that the statements were taken—was not under the influence of alcohol or drugs—that he was coherent and responded understandably—that at no time were any promises or threats or offers of reward—or there was no violence or threat of violence—made to persuade or induce the defendant to make a statement or either—that the defendant was given the Miranda warnings—and rights—which were taken from the Miranda card—and included the right to remain silent and the other provisions which the Court has found the—in fact from the—from the document itself—which was submitted and entered into evidence—which the Court has now found as a fact—that all rights contained in the Miranda card were read to the defendant—who signed a waiver of these rights—including the right to have a lawyer present—which he indicated that he did not want—that the interrogation took place—at which time that only the two officers at any one time were present—that—based upon the foregoing facts—the Court concludes that none of the defendant's constitutional rights—either federal or state were violated by reason of his arrest, detention, interrogation or confession. That the statements made that are by the defendant to the officers on the 28th January, 1982, were freely, knowing-

State v. Stokes

ly, voluntarily, and under — understandably made — that the defendant was in full understanding of his constitutional rights to remain silent, right to counsel, and all the other rights which he freely, knowingly, intelligently and voluntarily waived.

The trial judge thereupon overruled defendant's motion to suppress and ruled that the statement was admissible into evidence.

Defendant contends that his statement was involuntary and inadmissible into evidence because (1) he was confronted with statements which implicated him in the crime, (2) he was threatened with the death penalty, and (3) he had a low I.Q. which, considered with the other matters surrounding his confession, rendered the confession involuntary. We consider these contentions *seriatim*.

[4] It is well settled in this jurisdiction that the confrontation of an accused with inculpatory evidence does not render an ensuing confession inadmissible absent trickery, coercion or other improper inducements. *State v. Mitchell*, 265 N.C. 584, 144 S.E. 2d 646 (1965), *cert. denied*, 384 U.S. 1024, 86 S.Ct. 1972, 16 L.Ed. 2d 1029 (1966); *State v. Smith*, 213 N.C. 299, 195 S.E. 819 (1938). *See also State v. Booker*, 306 N.C. 302, 293 S.E. 2d 78 (1982). It is not the disclosure of the evidence to an accused, but an impermissible use of such evidence which may affect the admissibility of a confession. *State v. Booker, supra.* More specifically, we have held that confronting an accused with statements of his co-defendants which implicate him in a crime does not, standing alone, render an ensuing confession involuntary. *State v. McNeil*, 263 N.C. 260, 139 S.E. 2d 667 (1965). *See also State v. Hines*, 266 N.C. 1, 145 S.E. 2d 363 (1965). We find the rule stated in *McNeil* to be consistent with other jurisdictions. *Williams v. Ohio*, 547 F. 2d 40 (6th Cir. 1976), *cert. denied*, 435 U.S. 998, 98 S.Ct. 1654, 56 L.Ed. 2d 88 (1978); *Degler v. State*, 257 Ark. 388, 517 S.W. 2d 515 (1974); *Gibson v. State*, 347 So. 2d 576 (Ala. Cr. App. 1977); *People v. Smith*, 93 Ill. App. 3d 1133, 418 N.E. 2d 172 (1981).

[5] Defendant's contention that he was coerced into confessing by threats that he would go to the gas chamber unless he admitted to his participation in the charged crimes will not support this assignment of error.

The evidence on this point was in sharp conflict. The court heard the evidence of the State and the evidence of defendant and resolved this conflict by finding that "at no time were any promises or threats . . . made to persuade or induce the defendant to make a statement . . ." When the court's findings are supported by competent evidence such findings are binding on the appellate court. *State v. Easterling*, 300 N.C. 594, 268 S.E. 2d 800 (1980); *State v. Jackson*, 292 N.C. 203, 232 S.E. 2d 407, *cert. denied*, 434, U.S. 850, 98 S.Ct. 160, 54 L.Ed. 2d 118 (1977).

Defendant finally seeks to support this assignment of error on the theory that the above-discussed matters in combination with his low I.Q. (63), rendered his confession involuntary.

**[6]** A subnormal mental condition standing alone will not render an otherwise voluntary confession inadmissible. *State v. White*, 291 N.C. 118, 229 S.E. 2d 152 (1976); *State v. Thompson*, 287 N.C. 303, 214 S.E. 2d 742 (1975), *death sentence vacated* 428 U.S. 908, 96 S.Ct. 3215, 49 L.Ed. 2d 1213 (1976). Thus, defendant's argument becomes feckless since we have found no merit in the other matters which defendant contends tended to render his confession involuntary. It appears from the record that defendant could read and write and that he had completed the tenth grade in school. Further, the trial judge who observed defendant and heard the testimony presented concluded that defendant "knowingly, voluntarily, and . . . understandably" made the inculpatory statement.

There is ample evidence to support the trial judge's findings of fact. These findings, in turn, support the conclusions of law and the trial judge's ruling denying defendant's motion to suppress.

**[7]** Defendant next contends that the trial judge erred by failing to grant his motions for judgment as of nonsuit at the close of the State's evidence and at the completion of all the evidence.

When we consider the evidence in the light most favorable to the State, allow the State the benefit of every inference of fact that may reasonably be drawn therefrom, and disregard all discrepancies and contradictions in the evidence, as we must, we conclude that there was ample evidence to repel defendant's motions. *State v. Dollar*, 292 N.C. 344, 233 S.E. 2d 521 (1977); *State v. Witherspoon*, 293 N.C. 321, 237 S.E. 2d 822 (1977).

The evidence tended to show that defendant clubbed the victim to the ground and took his automobile and other property. There was medical evidence that the victim died as a result of blows to the head from a blunt instrument. There was further evidence tending to show that defendant was seen in the victim's stolen automobile shortly after the killing took place and articles taken from the victim were found in defendant's possession.

This evidence was sufficient to permit the jury to reasonably infer that the crimes charged were committed and that defendant was the perpetrator of the crimes. This assignment of error is overruled.

## II

### SENTENCING PHASE

[8]  Defendant argues that in light of the evidence that he was only the lookout the court should have instructed the jurors that in order to impose the death penalty, they would have to find that defendant killed, attempted to kill, or intended or contemplated that Mr. Lehto would be killed. We agree, and for reasons hereinafter stated, this cause is remanded for a new sentencing hearing.

The landmark case on this question is *Enmund v. Florida*, --- U.S. ---, 102 S.Ct. 3368, 73 L.Ed. 2d 1140 (1982). We note that the able trial judge did not have the benefit of this decision when this case was tried. In *Enmund*, Sampson and Jeanette Armstrong went to the home of an elderly couple and robbed and killed them. Enmund drove the getaway car. There was no evidence that Enmund had actually participated in the killing of the couple or that he attempted to kill or intended that they be killed. Under the then existing Florida law, Enmund was convicted of felony murder as a principal in the second degree and was sentenced to death. The Supreme Court of Florida found no error in the trial but the United States Supreme Court reversed the death sentence. In so holding, the Court pointed out that the death sentence was excessive punishment for an armed robber who, as such, did not take human life. The Court also emphasized that in determining whether the death penalty is an appropriate punishment, the focus of the inquiry must be in the individual conduct of

an accused and not on the conduct of others. Mr. Justice White, speaking for the Court, stated:

> Here the robbers did commit murder; but they were subjected to the death penalty only because they killed as well as robbed. The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for Enmund's own conduct. The focus must be on his culpability, not on that of those who committed the robbery and shot the victims, for we insist on "individualized consideration as a constitutional requirement in imposing the death sentence," *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed. 2d 973, [990] (1978) (footnote omitted), which means that we must focus on "relevant facets of the character and record of the individual offender." *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed. 2d 944, [961] (1976).

--- U.S. at ---, 102 S.Ct. at 3377, 73 L.Ed. 2d at 1152. The Court concluded:

> Because the Florida Supreme Court affirmed the death penalty in this case in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken, we reverse the judgment upholding the death penalty and remand for further proceedings not inconsistent with this opinion.

--- U.S. at ---, 102 S.Ct. at 3379, 73 L.Ed. 2d at 1154.

The case before us differs from *Enmund* in that here there was strong evidence that defendant himself robbed the victim and delivered the fatal blows. This evidence would have permitted conviction of felony murder and would have supported the imposition of the death penalty. However, the State offered defendant's confession which, in part, stated that defendant participated in the crime only as a lookout, and that he did not deliver the fatal blows. We quote from that confession:

> When we reached the Pace Setter Tie and Shirt factory—Ricky and Lorenzo crossed the street headed toward the Bond—the Bonded Warehouse. I crossed over the street with them—I went to the Hanover Work Shop which is across from the Wilmington Bonded Warehouse and stood

beside the work shop building and a fence. Ricky and Lorenzo went up on the concrete ramp located at the Wilmington Bonded Warehouse. They stood in the corner behind the door located on the ramp. I was still standing beside the warehouse—correction—beside the work shop—waiting on them —was watching out for them. I then saw an old man—correction—saw an old white man come out of the door located at the top of the concrete ramp. The old man had a brief case in his hand. It looked like he was getting ready to lock the door when Lorenzo struck him with the stick that he was carrying. When the old man was hit with the stick—he turned toward Lorenzo and Ricky who was still in the corner —Lorenzo then hit the old man again. The old man then fell back onto the concrete ramp. Lorenzo and Ricky started going through the old man's pockets. While Lorenzo and Ricky were going through the old man's pockets—the old man was throwing up blood from his mouth. Lorenzo and Ricky then came down the ramp and went to a car located in front of the Wilmington Bonded Warehouse next to a light pole. I then crossed over the dirt road and went to where Lorenzo and Ricky was at—when I approached them they were taking money of a black wallet. They started passing out the money. Lorenzo gave me one hundred and fifty dollars—which was a hundred dollar bill, two twenty dollar bills and one ten dollar bill. Lorenzo then stuck a brown long wallet in his pocket. Lorenzo then gave Ricky some money also. Lorenzo had some car keys in his hand. I took the car keys from him—I unlocked the driver's side of the door—driver's side door of the car—I started the car up and left. Lorenzo and Ricky did not get into the car. I left them at the Bonded Warehouse. . . .

When several persons aid and abet each other in an armed robbery in the course of which the victim is fatally wounded, all being present, each person is guilty of murder in the first degree. *State v. Peplinski,* 290 N.C. 236, 225 S.E. 2d 568, *cert. denied,* 429 U.S. 932, 97 S.Ct. 339, 50 L.Ed. 301 (1976). Nevertheless, we must decide whether the sentencing jury correctly recommended the death penalty.

At the guilt phase of the trial, the trial judge correctly instructed the jury that defendant could be found guilty of felony murder under the theory that defendant was the actual per-

petrator of the crime and struck the fatal blows during the course of the robbery. He also instructed that defendant could be convicted upon the theory that although not the actual perpetrator, he was present and aided and abetted in the commission of the robbery and the resultant felony murder actually committed by another.

The verdict of the jury was guilty of first-degree murder. There was no indication as to the theory upon which defendant was convicted.[1]

*Enmund* dictates that absent proof that a defendant killed or attempted to kill or intended or contemplated that life would be taken, the death penalty cannot be imposed. The facts of this case require a resolution of whether this case comes within the purview of that holding.

We hold that failure to give the instruction required by *Enmund* was prejudicial error requiring remand to the Superior Court of New Hanover County for proceedings consistent with this opinion.

Therefore, in instant case, at the new sentencing hearing and before the sentencing jury begins its consideration of aggravating and mitigating circumstances toward returning its recommendation as to punishment, the trial judge should submit to and the jury answer issues as follows:

1. Did defendant deliver the fatal blows which caused the victim's death?

2. If not, did defendant, while acting as an aider and abettor, attempt to kill, intend to kill, or contemplate that life would be taken during the commission of the felony?

---

1. Judicial economy requires that when first-degree murder is submitted to the jury on more than one theory at the guilt-innocence phase of the trial, the trial judge should submit the issues so as to require the jury to indicate the theory upon which their verdict is returned. *See State v. Goodman,* 298 N.C. 1, 257 S.E. 2d 569 (1979). This requirement would, in many instances, obviate the necessity of considering the *Enmund* holding at the sentencing phase of a trial. For instance, if accused is convicted of first-degree murder on the theory of premeditated and deliberated murder, the *Enmund* holding would have no application. Likewise, *Enmund* would not apply in a felony murder case if all the evidence discloses that the accused was the actual perpetrator of the crime who delivered the fatal blows.

Of course, defendant and the State will be permitted to offer competent evidence pertinent to the resolution of these issues.

If the jury should answer either of the above-stated questions "yes," then the jury would proceed to hear competent evidence concerning the aggravating and mitigating circumstances and return its recommendation as to whether defendant's punishment should be imprisonment for life or the death sentence. However, if the jury should answer both issues "no," it would return a recommendation of life imprisonment.

We wish to make it clear that the additional procedure herein set out is only necessary when the *Enmund* question is presented.

Although we have held that there must be a new sentencing hearing in light of the *Enmund* decision, we find it necessary to consider the refusal of the trial judge to instruct the jury that it could consider certain mitigating circumstances which were specifically requested by defendant since these questions may recur at the next sentencing hearing. In this connection, we deem it appropriate to summarize certain established guidelines.

The trial judge should submit to the jury in writing any mitigating circumstance listed in G.S. 15A-2000(f)(1), (2), (3), (4), (5), (6), (7) and (8) which is supported by the evidence. Further, pursuant to G.S. 15A-2000(f)(9), the trial judge should submit in writing any other relevant circumstance proffered by and specifically requested by a defendant which is supported by the evidence and from which the jury might reasonably find mitigating value.

[9] The burden of persuading the jury as to the existence of any mitigating circumstance is upon the defendant to so prove by a preponderance of the evidence, and when all the evidence tends to show the existence of a particular mitigating circumstance, a defendant is entitled to a peremptory instruction on that issue. *State v. Johnson,* 298 N.C. 47, 257 S.E. 2d 597 (1979). Even when a defendant offers no evidence to support the existence of a mitigating circumstance, the mitigating circumstance must be submitted when the State offers or elicits evidence from which the jury could reasonably infer that the circumstance exists. *See State v. Hutchins,* 303 N.C. 321, 279 S.E. 2d 788 (1981).

The trial judge's determination of whether a mitigating circumstance should be submitted to the sentencing jury should be guided by our statement in *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, --- U.S. ---, 103 S.Ct. 474, 74 L.Ed. 2d 622 (1982), *reh. denied*, --- U.S. ---, 103 S.Ct. 839, 74 L.Ed. 2d 1031 (1983). There Justice Copeland speaking for the Court, stated:

> Moreover, we must also point out that common sense, fundamental fairness and judicial economy dictate that any reasonable doubt concerning the submission of a statutory or requested mitigating factor be resolved in the defendant's favor to ensure the accomplishment of complete justice at the *first* sentencing hearing.

306 N.C. at 27, 292 S.E. 2d at 223.

Here the trial judge denied defendant's request that the jury be instructed on four of the mitigating circumstances listed in G.S. 15A-2000(f) and three mitigating circumstances pursuant to the provisions of G.S. 15A-2000(f)(9). The specifically enumerated mitigating circumstances listed in G.S. 15A-2000(f) are deemed to have mitigating value since they are specifically set out in the statute. *State v. Pinch, supra*. Therefore, our inquiry as to the statutorily enumerated mitigating circumstances is limited to the question of whether there was sufficient evidence from which the jury could reasonably infer that these mitigating circumstances existed.

[10] We first consider the question of whether the trial judge erred by refusing, upon defendant's request, to submit as a mitigating circumstance that defendant had no significant history of prior criminal activity. G.S. 15A-2000(f)(1).

Defendant failed to present any evidence of his lack of prior criminal history. However, upon cross-examination of defendant, the State elicited evidence of numerous past criminal activities. This evidence disclosed that on 10 February 1974 defendant broke into and stole property from a van. On 17 February 1974, defendant broke into and stole property from a vending machine. On 1 January 1975, defendant broke into a car and stole some tapes. On 18 June 1979, he assaulted a female. On 18 July 1979, he stole an air conditioning unit from the Houston-Moore Community Center and sold it. On 15 August 1979, he stole an air condition-

ing unit from the Lake Forest School. On 30 November 1981, he broke and entered the home of Gloria Robinson. He admitted that he sold marijuana on numerous occasions and that he possessed marijuana on many occasions for his own personal use. Finally, defendant testified that he had stolen marijuana from other drug dealers.

We cannot perceive how a jury could, in the face of this evidence, reasonably find defendant's criminal history to be other than significant. We therefore hold that the trial judge correctly refused to submit the mitigating circumstance of no significant history of prior criminal activity.

[11] Defendant next assigns as error the trial court's denial of his request that the jury be instructed that the capital felony was committed while he was under the influence of a mental or emotional disturbance. G.S. 15A-2000(f)(2).

At the sentencing hearing, defendant's sister testified that at a young age defendant had been treated by Dr. Fisscher, a psychiatrist at a Mental Health Center, for mental problems. Pursuant to a stipulation between the State and defense counsel, a report was admitted into evidence which showed that Dr. Mary M. Rood, a forensic psychiatrist at Dorothea Dix Hospital in Raleigh, examined defendant to determine whether he was competent to stand trial and whether he was able to distinguish right from wrong at the time the offenses were committed. This report indicated that defendant had an I.Q. of 63 and a reading level of 2.9. His social history contained in the report indicated that by age ten, defendant was being treated at a mental health center where he was diagnosed as having an unsocialized aggressive behavior and borderline mental retardation. The report also indicated that these conditions had been unsuccessfully treated with medication. Dr. Rood's own diagnosis was that defendant was mildly mentally retarded and had an antisocial personality disorder. However, she concluded that defendant was competent to stand trial and that he was capable of distinguishing right from wrong at the time the offenses were committed.

Although it was not an issue in that case, we note that in *State v. Smith*, 305 N.C. 691, 292 S.E. 2d 264, *cert. denied*, --- U.S. ---, 103 S.Ct. 474, 74 L.Ed. 2d 622 (1982), there was psychiatric testimony that the defendant suffered from "the emo-

tional disturbance of antisocial personality." *Id.* at 704, 292 S.E. 2d at 272. There, the trial judge submitted the mitigating factor set forth in G.S. 15A-2000(f)(2) and the jury found this factor to exist.

We believe that the evidence presented here was sufficient for the jury to reasonably find that defendant was under the influence of a mental or emotional disturbance at the time the crimes were committed. The trial judge should have submitted to the sentencing jury the mitigating factor set forth in G.S. 15A-2000(f)(2).

[12] Relying on the same evidence set forth in the preceding assignment of error, defendant contends that the trial court erred in failing to submit to the sentencing jury the mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. G.S. 15A-2000(f)(6).

We considered the circumstances under which this mitigating circumstance could be said to exist in the case of *State v. Johnson, supra.* We quote the following pertinent language from that case:

> This mitigating circumstance may exist even if a defendant has capacity to know right from wrong, to know that the act he committed was wrong, and to know the nature and quality of that act. It would exist even under these circumstances if the defendant's capacity to appreciate (to fully comprehend or be fully sensible of) the criminality (wrongfulness) of his conduct was impaired (lessened or diminished), or if defendant's capacity to follow the law and refrain from engaging in the illegal conduct was likewise impaired (lessened or diminished).

298 N.C. at 68, 257 S.E. 2d at 613.

Here, defendant presented lay testimony that he had a long history of treatment for mental problems which began when he was ten years old. Dr. Mary M. Rood's stipulated testimony was to the effect that she had examined defendant after the commission of the charged crime and that in her opinion, defendant was mildly retarded and had an antisocial disorder. Applying this evidence to the rule set forth in *State v. Johnson, supra,* we con-

clude that there was sufficient evidence to permit, but not require, the sentencing jury to reasonably infer that defendant's capacity to fully comprehend the wrongfulness of his conduct was impaired or diminished. Thus, the trial judge should have submitted the mitigating circumstance set forth in G.S. 15A-2000(f)(6) to the sentencing jury.

[13] We next consider defendant's argument that the trial court erred in failing to instruct the sentencing jury that it could consider as a mitigating circumstance that defendant was an accomplice in or an accessory to the capital felony committed by another person and that his participation was relatively minor. G.S. 15A-2000(f)(4).

In order to be entitled to an instruction on this mitigating circumstance, it is necessary that there be evidence tending to show (1) that defendant was an accomplice in or an accessory to the capital felony committed by another, and (2) that his participation in the capital felony was relatively minor. G.S. 15A-2000(f)(4).

In the case before us for decision, defendant testified at trial that he had no part in the crime. The State offered a purported confession which tended to show that defendant was a lookout but did not deliver the fatal blows. Also, there was evidence to the effect that defendant actually delivered the blows which caused the victim's death.

This conflicting testimony created a question of fact for the sentencing jury as to whether defendant was an accomplice or accessory to the murder of Mr. Lehto and as to whether his participation in the capital felony was relatively minor. If the jury accepted defendant's confession, it could have found that defendant's role as a lookout was relatively minor when compared to the conduct of other participants in the commission of the crime. Therefore, pursuant to the admonition in *State v. Pinch* that "any reasonable doubt concerning the submission of a statutory or requested mitigating factor be resolved in the defendant's favor," 306 N.C. at 27, 292 S.E. 2d at 223, we hold that the trial court erred by failing to submit the mitigating circumstance set forth in G.S. 15A-2000(f)(4).

Defendant contends that the court erred by denying his request to submit three non-statutory mitigating circumstances pur-

suant to G.S. 15A-2000(f)(9). Since defendant made a timely request that these possible mitigating circumstances be submitted to the jury, our inquiry is whether these circumstances are supported by the evidence and whether these circumstances are such that the jury could reasonably deem them to have mitigating value. *State v. Johnson, supra.*

The three circumstances for our consideration are as follows:

(9) The defendant in his formative years was subjected to cruelty and physical abuse by his parents.

(11) The defendant in his formative years was subjected to mental abuse by his parents.

(15) The defendant is an illegitmate child and has never experienced a relationship with his natural father.

We are of the opinion that the jury could have reasonably found each of these circumstances to have mitigating value. Accordingly, the trial judge should have granted defendant's request to submit these circumstances if they were supported by the evidence.

[14] We hold that the trial court did not err in refusing to submit Nos. (9) and (11) as mitigating circumstances because there is absolutely no evidentiary support for either in the record.

[15] The trial court's refusal to submit to the sentencing jury the mitigating circumstance that defendant was an illegitimate child and never experienced a relationship with his natural father presents a more difficult question.

The undisputed evidence established that defendant was an illegitimate child. The evidence further showed that defendant's natural father was Frank Myers. A marriage was never consummated between defendant's mother and Myers, but Myers lived with her "off and on" in the past. Defendant knew that Myers was his natural father.

Defendant's older sister testified that she had the responsibility of rearing defendant since his mother was often away working to help support the family. She was specifically asked to describe the relationship between defendant and his natural father. She responded that defendant's father had left the

household when defendant was about five or six years old. At about that time, defendant was in an accident and sustained a serious injury to his leg. On occasion, defendant's father would come to the home to check on him and see how he was progressing. The witness was also asked if defendant's father had ever taken him to the hospital or to see a doctor. She replied that although the father was not in the home, defendant's mother would "call him and tell him that Freddie had to go to the hospital or something like that and he could come out there."

We are of the opinion that although this evidence indicates that the best relationship did not exist between defendant and his father, it was insufficient to show that he *never* experienced *a* relationship with his natural father.

We therefore hold that the trial judge correctly refused to submit this possible mitigating circumstance to the jury.

In the guilt-innocence phase of the trial we find no error.

For the reasons stated, the verdict rendered at the sentencing phase of defendant's trial and the judgment sentencing defendant to death are vacated and this cause is remanded to the Superior Court of New Hanover County for a new trial on the sentencing phase.

No error in the guilt-innocence phase of the trial.

New trial on sentencing phase of the trial.