STATE OF NORTH CAROLINA v. JERRY DALE HILL

No. 535A95

(Filed 7 November 1997)

### 1. Criminal Law § 78 (NCI4th Rev.)— capital first-degree murder—motion for change of venue—pretrial publicity—defendant's jailhouse interview

The trial court did not err by denying a change of venue for a defendant in a capital prosecution for first-degree murder, arson, felonious breaking and entering, first-degree rape, and first-degree sexual offense where defendant offered into evidence television news coverage and newspaper articles which contained incriminating statements made by defendant in a jailhouse interview with a reporter and testimony from four local attorneys that defendant could not receive a fair trial in Harnett County. While a number of jurors indicated they had read or heard of the crime, each juror who actually served on the jury stated unequivocally that he or she had formed no opinion about the case, could be fair and impartial, and would decide the issues based on the evidence presented at trial. The issue on appeal was whether the trial court erred by refusing to grant defendant's motion for a change of venue, not allowing a reporter access to an incarcerated defendant without counsel being present (which is disapproved). Finally, the totality of the circumstances does not reveal a county infected with prejudice against defendant, as in *State v. Jerrett*, 309 N.C. 239.

**Am Jur 2d, Criminal Law §§ 372-397; Homicide § 204; Venue §§ 62-64.**

**Pretrial publicity in criminal case as ground for change of venue. 33 ALR3d 17.**

### 2. Jury § 227 (NCI4th)— capital murder—jury selection—ambivalence concerning death penalty—juror excused for cause

The trial judge did not abuse its discretion in a capital prosecution for first-degree murder and other crimes by excusing a prospective juror for cause where the juror responded unequivocally and affirmatively to the trial court's initial inquiry concerning her ability to impose the death penalty despite her opposition to the death penalty; during the State's questioning, she indicated

STATE v. HILL

[347 N.C. 275 (1997)]

that she would hold the State to a higher burden of proof than the law required; the court then intervened and explained to the juror the State's burden; the State then resumed questioning and the juror answered affirmatively when asked whether she was saying that she would have to be convinced beyond all doubt; defense counsel resumed questioning and the juror stated that she could follow the trial court's instructions and apply the reasonable doubt standard; the court further examined the juror; and she replied that she could not impose the death penalty.

**Am Jur 2d, Criminal Law § 685; Jury § 279.**

**Comment note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

3. **Jury § 153 (NCI4th)— jury selection—capital murder—question by court—whether juror could stand and recommend death**

The trial court did not abuse its discretion during jury selection in a capital prosecution for first-degree murder by asking a prospective juror whether she could personally stand up and recommend the death penalty. As in *State v. White*, 343 N.C. 378, the trial court sought to clarify the juror's position on the death penalty because of her equivocal responses concerning the death penalty.

**Am Jur 2d, Jury § 196.**

**Comment note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

4. **Jury § 226 (NCI4th)— jury selection—capital murder—rehabilitation—denied**

The trial court did not abuse its discretion during jury selection for a capital first-degree murder prosecution by refusing defendant the opportunity to rehabilitate a juror. The trial court did not refuse because it believed it was required to do so as a matter of law; the transcript supports the court's findings concerning the juror's views; and defendant failed to show that further questioning would have resulted in her rehabilitation.

**Am Jur 2d, Jury § 202.**

STATE v. HILL

[347 N.C. 275 (1997)]

**5. Evidence and Witnesses § 264 (NCI4th)— first-degree murder—16-year-old-victim—prior marriage and pregnancy—excluded**

The trial court did not err in a capital prosecution for first-degree murder, arson, felonious breaking and entering, first-degree rape, and first-degree sexual offense by allowing the State's motion *in limine* to exclude from the guilt and penalty phases evidence of the 16-year-old victim's previous marriage and pregnancy. Although defendant argued that the evidence was relevant to prevent the State "from misleading the jury by pretending that the victim was a naive, immature girl," and is a circumstance surrounding one of the parties, the question has no bearing on defendant's guilt. An SBI agent mentioned the marriage during the State's direct examination, but defense counsel never objected to the evidence and never attempted to have evidence admitted based on the testimony. Finally, the transcript of the sentencing hearing does not reveal any instance where defendant attempted to have the evidence admitted. N.C.G.S. § 8C-1, Rule 401.

**Am Jur 2d, Evidence §§ 496-506.**

**Modern status of rules as to use of motion in limine or similar preliminary motion to secure exclusion of prejudicial evidence or reference to prejudicial matters. 63 ALR3d 311.**

**Constitutionality of "rape shield" statute restricting use of evidence of victim's sexual experiences. 1 ALR4th 283.**

**6. Evidence and Witnesses § 264 (NCI4th)— capital murder— victim's prior marriage and pregnancy—excluded—reason for exclusion—irrelevant if ruling correct**

The trial court did not err in a capital prosecution for first-degree murder and other crimes by excluding evidence of the 16-year-old victim's prior marriage and pregnancy; although defendant contended that the evidence was improperly excluded under N.C.G.S. § 8C-1, Rule 412, it does not matter whether the court gave the correct or best reason for excluding the evidence so long as its ruling was correct.

**Am Jur 2d, Trial § 397.**

STATE v. HILL

[347 N.C. 275 (1997)]

Constitutionality of "rape shield" statute restricting use of evidence of victim's sexual experiences. 1 ALR4th 283.

**7. Criminal Law § 568 (NCI4th Rev.)— capital murder—elicitation of hearsay—mistrial—denied**

The trial court did not err in a capital prosecution for first-degree murder and other crimes by denying defendant's motion for a mistrial based on the repeated elicitation of the hearsay statement concerning a comment defendant had made about the victim. A review of the record reveals that the witness's testimony concerning the hearsay statement was inadvertent and that the witness was confused concerning what he could testify to; this isolated instance hardly represents prosecutorial misconduct and the record makes clear that the trial court attempted to rectify the situation. The inadvertent hearsay did not result in substantial and irreparable prejudice to defendant's case.

**Am Jur 2d, Trial § 249; Witnesses § 859.**

**8. Criminal Law § 553 (NCI4th Rev.)— capital murder—closing argument—hyperbolic language—mistrial denied**

The trial court did not err by not granting a mistrial *ex mero motu* based on alleged prosecutorial misconduct during closing arguments in the guilt and sentencing phases of a prosecution for capital murder and other crimes where the prosecutor referred to the crime as perhaps the most atrocious that has occurred in Harnett County. Hyperbolic language is acceptable in jury argument so long as it is not inflammatory or grossly improper and similar language has been allowed in previous cases.

**Am Jur 2d, Trial § 496.**

**9. Criminal Law § 553 (NCI4th Rev.)— capital murder—prosecutor's argument—two people acting together—previous disavowal of acting in concert**

The trial court did not err by not granting a mistrial *ex mero motu* in a capital prosecution for first-degree murder and other crimes where the prosecutor argued that defendant was guilty even if someone else was with him because "two people acting together can commit a crime" even though the State had previously declined to rely on an acting-in-concert theory. The remark was made in a nontechnical way that required no understanding about the law of acting in concert or aiding and abetting. Viewed

contextually, the argument merely reflected that defendant is not absolved of his own actions even if someone else was present at the scene.

**Am Jur 2d, New Trial § 167.**

**10. Criminal Law § 553 (NCI4th Rev.)— capital murder—prosecutor's argument—mistrial denied**

The trial court did not err by not intervening *ex mero motu* or declaring a mistrial in a capital prosecution for first-degree murder and other crimes where the prosecutor in the sentencing phase routinely referred to the 16-year-old victim by her married name (introduction of her prior marriage and pregnancy had been disputed); argued that the victim's being shot in the head multiple times at point blank range renders this killing especially heinous, atrocious, or cruel; argued that the brutality here exceeded that normally present in any killing; characterized the mitigating circumstances as excuses; and argued that defendant bore the burden of proving the mitigating circumstances, even though the State had already stipulated to the existence of one of the statutory mitigating circumstances.

**Am Jur 2d, New Trial §§ 162, 163.**

**11. Criminal Law § 553 (NCI4th Rev.)— capital murder—prosecutor's argument—defense experts—mistrial denied**

The trial court did not err in a capital prosecution for first-degree murder and other crimes by not declaring a mistrial *ex mero motu* where the prosecutor argued that many of the submitted mitigating circumstances were developed by defense experts who testify around the state for capital defendants at rates from $75 to $125 per hour. Assuming that the prosecutor's statements were improper, they do not entitle defendant to a new sentencing hearing.

**Am Jur 2d, New Trial § 195.**

**12. Criminal Law § 1384 (NCI4th Rev.)— capital sentencing—mitigating circumstance—mental or emotional disturbance—not submitted**

The trial court did not err in a capital sentencing hearing by not submitting the statutory mitigating circumstance that the murder was committed while defendant was under the influence of a mental or emotional disturbance. Testimony indicated that

defendant's IQ was within the low average range, a clinical forensic psychologist testifying for the defense concluded that the primary personality characteristics exhibited by defendant were emotional and social alienation and that she found no evidence of psychosis, and she also testified that she had found mild depression, which could result from his recent incarceration; defendant's expert witnesses did not provide a nexus between his personality characteristics and the crimes he committed; and the manner of the killing and his subsequent actions indicate that he was not under the influence of a mental or emotional disturbance at the time of the killing. N.C.G.S. § 15A-2000(f)(2).

**Am Jur 2d, Homicide § 515.**

**Comment note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

**Test of insanity in federal criminal trial. 1 ALR Fed. 965.**

13. **Criminal Law § 1388 (NCI4th Rev.)— capital sentencing—mitigating circumstances—impaired capacity—not submitted**

The trial court did not err during a capital sentencing hearing by not submitting the statutory mitigating circumstance of impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the law where the testimony did not establish that his personality characteristics affected his ability to understand and control his actions. In fact, both of defendant's experts testified to the contrary. N.C.G.S. § 15A-2000(f)(6).

**Am Jur 2d, Homicide § 516.**

**Modern status of rules as to burden and sufficiency of proof of mental irresponsibility in criminal case. 17 ALR3d 146.**

**Comment note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

14. **Criminal Law § 693 (NCI4th Rev.)— capital sentencing—mitigating circumstances—no significant criminal history—directed verdict**

There was no plain error in a capital sentencing hearing by not directing a verdict on the statutory mitigating circumstance that defendant had no significant history of prior criminal activ-

ity where the State had agreed to stipulate to the fact. The trial court directed the jurors to affirmatively answer as to the mitigating circumstance of no significant history of criminal activity and further stated that they were required to find the existence of at least one mitigating circumstance in Issue Two. These instructions did not allow the jury to answer no to the existence of the statutory (f)(1) mitigator. Although the trial court did not completely eliminate all remarks that might allow the jurors discretion in finding the circumstance, the trial court in fact directed a verdict on this circumstance.

**Am Jur 2d, Trial § 1760.**

15. **Criminal Law § 1402 (NCI4th Rev.)— death penalty—not disproportionate**

A death sentence for first-degree murder was not disproportionate where the evidence supports each aggravating circumstance found, the sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor, this case is distinguishable from each of the seven cases found disproportionate, and the present case is more similar to certain cases in which a death sentence was found proportionate than to those in which the sentence found disproportionate or those in which juries have consistently returned recommendations of life imprisonment.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Gore, J., on 31 October 1995 in Superior Court, Harnett County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional convictions and judgments was allowed 3 February 1997. Heard in the Supreme Court 9 September 1997.

*Michael F. Easley, Attorney General, by William B. Crumpler, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Marshall Dayan, Assistant Appellate Defender, for defendant-appellant.*

STATE v. HILL

[347 N.C. 275 (1997)]

ORR, Justice.

This case arises out of the rape and murder of Angie Porter Godwin. On 10 July 1995, defendant was indicted for first-degree murder, arson, felonious breaking and entering, first-degree rape, and first-degree sexual offense. Defendant was tried capitally before a jury, and on 25 October 1995, the jury found defendant guilty of all charges. Following a capital sentencing proceeding, the jury recommended a sentence of death for the murder conviction. In accordance with the jury's recommendation, the trial court entered a sentence of death for the first-degree murder conviction based on premeditation and deliberation and the felony murder rule; the trial court also sentenced defendant to consecutive sentences of life imprisonment for the first-degree rape conviction, twelve years for the second-degree arson conviction, three years for the felonious breaking and entering conviction, and life imprisonment for the first-degree sexual offense conviction.

After consideration of the assignments of error brought forward on appeal by defendant and a thorough review of the transcript of the proceedings, the record on appeal, the briefs, and oral arguments, we conclude that defendant received a fair trial, free from prejudicial error. For the reasons set forth below, we affirm his convictions and sentences.

At trial, the State's evidence tended to show the following: On 19 February 1994, James Dandran was driving by Bob Porter's home in Broadway, North Carolina, when he noticed smoke coming from the residence. He immediately drove to a nearby store owned by Rex Johnson and asked Johnson to notify the fire department. Dandran then returned to the Porter home to check on Angie Porter Godwin, who had been visiting her father, Bob Porter. When he arrived, he went around to the side door, where he observed blood on the steps. No one answered when he called into the house, so he returned to Johnson's store and asked him to notify the police.

The chief of the Benhaven Fire Department, Ronnie Johnson, was the first to arrive at the scene, followed shortly thereafter by Deputy John Holly of the Harnett County Sheriff's Department. They attempted to enter the house through the front door, but the heat and smoke were too intense, and they were forced to turn back.

Once the fire was extinguished, Sheriff Larry Knott secured the area to prevent any evidence from being disturbed. The sheriff then

went to the side entrance of the house and observed a continuous trail of blood from the door down the steps and into the yard. It appeared that something had been dragged through the yard and into the woods behind the house. Approximately one hundred to two hundred yards away from the house, officers found the body of the victim. Sheriff Knott testified that leaves and pine straw had been raked up, piled around her body, and set on fire. The victim was lying on her back, nude, with her panties lying on her chest.

Chief Johnson identified the body as that of Angie Porter Godwin. He testified that her hair was burned off and that "one of her arms was just about burned off completely." Chief Johnson further stated that "[i]t was one of the most horrible things [he] had ever seen."

During the investigation of the Porter residence, officers found a shell casing in the hallway in front of the victim's bedroom door. They also found four .22-caliber shell casings in the woods where the victim's body was discovered. Agent Kim Heffney, an arson investigator with the SBI, took various samples from the house and the area where the body was discovered. Several of the samples revealed the presence of accelerants, either residual gasoline or residual kerosene, or a combination of the two.

Dr. John Butts, the chief medical examiner for the State of North Carolina, performed the autopsy on the victim on 20 February 1994. Dr. Butts noted that there was a considerable degree of burning on her body. He stated that the victim had four gunshot wounds to the head and scratches consistent with drag marks on the back of her body. In Dr. Butts' opinion, the victim died from the gunshot wounds to the head. Further, according to Dr. Butts, there was no evidence that the victim was alive at the time her body was set on fire.

Dr. Butts also collected specimens for evidentiary purposes, including swabs from the victim's vaginal and rectal region. These specimens were sent to the SBI laboratory in Raleigh for testing. Microscopic examination of these swabs indicated the presence of sperm in both the vaginal and rectal specimens. At the conclusion of these examinations, the swabs were preserved for further analysis, specifically DNA analysis. Mark Boodee, an expert in the field of DNA forensic analysis, testified that the DNA analysis revealed a match with defendant with respect to the sperm from both the vaginal and rectal specimens.

STATE v. HILL

[347 N.C. 275 (1997)]

During an interview with SBI Agent Michael East, defendant initially denied any involvement in the crimes being investigated. Later the next night, however, defendant admitted being involved in the crimes and gave a detailed confession to East. In his confession, defendant stated that he and an accomplice entered the house through the front door, then walked straight through the hallway and to the bedrooms located in the back of the house. As they neared the victim's bedroom, a squeaky floorboard awakened the victim. When she opened the door, defendant stated that his accomplice shot her twice in the head. Defendant then stated that his accomplice grabbed the victim's feet and dragged her through the living room, out the side door, and down a path into the woods. Once they reached the woods, defendant stated that he and his accomplice both had sex with the victim. Afterwards, they poured kerosene over the victim's body and inside the house and set both places on fire. They then left the Porter residence and drove to defendant's home, where they changed clothes. Next, they drove to a pond, where they discarded the murder weapon. Pursuant to specific directions from defendant, officers recovered a .22-caliber semiautomatic pistol from a pond in Sanford on 25 February 1994.

Defendant signed a written statement concerning his involvement, and the statement was introduced into evidence. Police efforts to confirm the existence of an accomplice were unsuccessful. Defendant also made several other incriminating statements to fellow inmates at the Harnett County jail which were introduced into evidence.

## I.

[1] Defendant first assigns as error the trial court's denial of his motion for a change of venue. Defendant argues that he could not obtain a fair and impartial jury because of pretrial publicity and that the denial of this motion violated his constitutional and statutory rights. We disagree.

The test for determining whether a change of venue should be granted is "whether, due to pretrial publicity, there is a reasonable likelihood that the defendant will not receive a fair trial." *State v. Jerrett*, 309 N.C. 239, 254, 307 S.E.2d 339, 347 (1983). The burden is on the defendant to show a reasonable likelihood that the prospective jurors will base their decision in the case upon pretrial information rather than the evidence presented at trial and will be unable to remove from their minds any preconceived impressions they might

STATE v. HILL

[347 N.C. 275 (1997)]

have formed. *Id.* at 255, 307 S.E.2d at 347. "The determination of whether defendant has shown that pretrial publicity prevented him from receiving a fair trial rests within the sound discretion of the trial court and will not be overturned absent a showing of an abuse of discretion." *State v. Gregory*, 340 N.C. 365, 384, 459 S.E.2d 638, 649 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 478 (1996).

In the present case, a hearing was held on 17 August 1995 on defendant's motion for change of venue. At the hearing, defendant offered into evidence a videotape of television news coverage concerning the case and newspaper articles about the case from the *Dunn Daily Record* and the *Harnett County News*. The publicity included articles containing incriminating statements defendant made to a reporter during a jailhouse interview. Defendant also offered the testimony of four local attorneys who were of the opinion defendant could not receive a fair trial in Harnett County. In ruling on the motion for change of venue, the trial court made the following findings of fact and conclusions of law:

> The court finds that the majority, if not all, of the publicity generated in the case, particularly in the local newspapers since the initial occurrence of the offense and the reporting of the arrest of the defendant, has been generated by the defendant himself.

> There has been no evidence that persons having heard about the case or about the defendant or who have, indeed, read, listened to, or watched any news accounts of the arrest of the defendant and investigation of the case would not be capable of laying aside those impressions or opinions and rendering a verdict based on the evidence presented in court.

> . . . .

> The court is not convinced that the testimony of defense attorneys as to word of mouth publicity or, quote, private talk, close quote, is sufficient in and of itself to predict that a jury cannot be assembled from Harnett County citizens and the court finds, based on the totality of the circumstances in this case, that the defendant has not proven that there is a reasonable likelihood that he could not be afforded a fair trial in Harnett County.

Defendant renewed his motion for a change of venue on 3 October 1995. At the hearing, defendant offered into evidence articles from the *Daily Record* published on 2 and 3 October 1995. In ruling

on the motion, Judge Gore found the articles to be essentially factual and stated that they were merely "a brief review of previous facts related in earlier editions of the paper." Because there was no other evidence presented in support of the renewed motion, Judge Gore once again denied defendant's motion for change of venue.

"N.C.G.S. § 15A-957 provides that if there is so great a prejudice against a defendant in the county in which he is charged that he cannot receive a fair trial, the court must transfer the case to another county or order a special venire from another county." *State v. Best,* 342 N.C. 502, 510, 467 S.E.2d 45, 50, *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 139 (1996). Under this statute, the burden is on the moving party to show that " 'it is reasonably likely that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed.' " *State v. Gardner,* 311 N.C. 489, 497, 319 S.E.2d 591, 597-98 (1984) (quoting *Jerrett,* 309 N.C. at 255, 307 S.E.2d at 347), *cert. denied,* 469 U.S. 1230, 84 L. Ed. 2d 369 (1985). "The best and most reliable evidence as to whether existing community prejudice will prevent a fair trial can be drawn from prospective jurors' responses to questions during the jury selection process." *State v. Madric,* 328 N.C. 223, 228, 400 S.E.2d 31, 34 (1991).

Here, while a number of the prospective jurors questioned in this case indicated they had read or heard of the crime, each juror who actually served on the jury stated unequivocally that he or she had formed no opinion about the case, could be fair and impartial, and would decide the issues based on the evidence presented at trial. During oral arguments, defendant focused on the newspaper articles published in the local papers as support for the motion for change of venue. Defense counsel noted that officials granted a reporter access to defendant in jail after the appointment of counsel and without counsel's knowledge. In his brief, defendant argued that this resulted in several highly prejudicial articles concerning the case which extensively quoted him. While we disapprove of officials allowing a reporter access to an incarcerated defendant without counsel being present, this issue is not before us. We are to determine whether the trial court erred by refusing to grant defendant's motion for change of venue. Having reviewed the transcript of the jury selection process, we are not persuaded that these newspaper articles prevented defendant from receiving a fair trial in Harnett County. As noted above, each juror who was seated indicated that he or she could

decide the case based on the evidence presented at trial. As this Court stated in *State v. Barnes*, 345 N.C. 184, 207, 481 S.E.2d 44, 56 (1997), "[w]e presume that jurors will tell the truth; our court system simply could not function without the ability to rely on such presumptions."

However, as we indicated in *Jerrett*, there is one more step to our analysis. In *Jerrett*, we held that where the totality of the circumstances reveals that a county's population is "infected" with prejudice against a defendant, we will find that the defendant has met his burden of showing that he could not receive a fair trial in that county. *Jerrett*, 309 N.C. at 258, 307 S.E.2d at 349. The notable features in *Jerrett* were that the crime occurred in a county with a population of 9,587 people; that the *voir dire* indicated that approximately one-third of the prospective jurors knew the victim, some member of the victim's family, or any of several witnesses for the State; and that the jury was examined collectively on *voir dire*.

However, the present case is distinguishable from *Jerrett*. Here, Harnett County's population at the time of the crime was 67,822. *North Carolina Manual 1993-1994*, at 874 (Lisa A. Marcus ed.). Further, the level of familiarity that the *Jerrett* jurors had with the victim, victim's family, and witnesses is not present in this case. Finally, although the *voir dire* was conducted collectively, it cannot be shown that it unduly prejudiced the prospective jurors. During *voir dire*, prospective jurors were frequently removed from the courtroom and taken to the jury deliberation room to allow for closer scrutiny of a prospective juror without tainting the others. Further, the trial court repeatedly warned the prospective jurors to avoid media coverage and discussions with others concerning the case. In viewing the totality of the circumstances, we conclude that there is not a reasonable likelihood that pretrial publicity prevented defendant from receiving a fair trial in Harnett County. Accordingly, the trial court did not err by refusing to grant defendant's motion for a change of venue.

## II.

**[2]** Next, defendant contends that the trial court erred by excusing a prospective juror for cause who was fit to serve. Defendant argues that the lengthy questioning of prospective juror Williams caused her to "giv[e] in to the prosecutor and the court," resulting in a violation of defendant's constitutional and statutory rights.

**STATE v. HILL**

[347 N.C. 275 (1997)]

The standard for determining whether a prospective juror may be excused for cause for his views on capital punishment is whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985). "The granting of a challenge for cause where the juror's fitness or unfitness is arguable is a matter within the sound discretion of the trial court and will not be disturbed absent a showing of abuse of discretion." *State v. Abraham*, 338 N.C. 315, 343, 451 S.E.2d 131, 145 (1994). This Court has recognized that a prospective juror's bias may not always be provable with unmistakable clarity and that, in such cases, reviewing courts must defer to the trial court's judgment concerning the prospective juror's ability to follow the law. *State v. Davis*, 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990).

In the present case, the transcript reveals that Williams responded unequivocally and affirmatively to the trial court's initial inquiry concerning her ability to impose the death penalty despite her opposition to the death penalty. However, during the State's questioning of Williams, she indicated that she would hold the State to a higher burden of proof than the law required before she could sentence defendant to death. The trial court then intervened and explained to Williams that the State has the burden of proving the evidence beyond a reasonable doubt and defined reasonable doubt as "doubt that is based on reason and common sense arising out of some or all of the evidence that has been presented in a case or from the lack of the evidence as the case may be." The trial court then allowed the State to continue with its questioning of Williams.

The State subsequently submitted the following question to Williams:

[THE PROSECUTOR]: Even though all the law requires before a jury can sentence a defendant convicted of first degree murder to death is that the State or the prosecution has proven to the jury beyond a reasonable doubt that under the facts and under the law death was appropriate, are you telling us that you would have to be convinced beyond all doubt that under the facts and under the law death was the appropriate verdict?

JUROR WILLIAMS: Yeah.

The trial court then allowed defense counsel to question Williams. Contrary to her previous answers, Williams stated that she could

**STATE v. HILL**

[347 N.C. 275 (1997)]

follow the trial court's instructions concerning the burden of proof and apply the "beyond a reasonable doubt" standard required by the law.

Because of the equivocal answers given by Williams, the trial court attempted to clarify her position on the death penalty:

> THE COURT: Okay, ma'am. What troubles me is that you essentially have given what I will call equivocal answers because you answered the district attorney's question in one way and it appears to me that you've answered the defense attorney's question in a way that's not in keeping with what you said to the district attorney. . . . And all I want you to do is tell me, can you fairly, fairly, consider both possible punishments if you should be asked to do that and come back with either one of them that you felt like was appropriate, or do you feel like because of your personal opposition to the death penalty you would not be able to do that?

> JUROR WILLIAMS: No.

> THE COURT: No, ma'am, what?

> JUROR WILLIAMS: No, I couldn't.

> . . . .

> THE COURT: You could not impose the death penalty?

> JUROR WILLIAMS: No, I couldn't.

Prospective juror Williams was subsequently excused for cause by the trial court.

"[Williams'] equivocal yet conflicting responses exemplify the situation anticipated by the United States Supreme Court in *Wainwright.*" *State v. Syriani*, 333 N.C. 350, 371, 428 S.E.2d 118, 129, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). A review of the transcript reveals that during *voir dire*, Williams stated, among other things, that she was "against capital punishment," that she considered capital punishment to be murder by the State, and that she was against the death penalty totally. At the conclusion of *voir dire*, Williams admitted that her personal beliefs interfered with her ability to impose the death penalty. Defendant's assertion that Williams was "browbeaten into giving in to the prosecutor and the court" and that Williams "ultimately relented to the pressure she felt" has no merit. A review of the record indicates that the thorough questioning by the

State and the trial court, as well as defense counsel, was necessary in light of the equivocal responses given by Williams. The trial court recognized the conflicting nature of Williams' answers and sought to clarify her position. Thus, the trial court did not abuse its discretion by excusing prospective juror Williams for cause. Accordingly, this assignment of error is overruled.

### III.

[3] Defendant next contends that the trial court erred by excusing a prospective juror for cause based upon her views concerning the death penalty. Defendant argues that the trial court erred "in two distinct respects" concerning the excusal of prospective juror Thorpe. First, defendant contends that the trial court erred by asking Thorpe whether she could personally stand up and recommend the death penalty, which defendant suggests caused her to change her answers as to the death penalty. Second, defendant contends the trial court erred by denying him the opportunity to rehabilitate prospective juror Thorpe. We disagree.

We will first address defendant's contention that the trial court erred by suggesting that Thorpe would have to personally come into the courtroom, stand up, and say "death." During *voir dire*, Thorpe expressed hesitancy in her ability to impose the death penalty and eventually indicated that she could not recommend death. Subsequently, the following exchange occurred:

> THE COURT: Okay. And again, ma'am, could you in an appropriate case after hearing all the evidence and the law being instructed by the Court go back, talk with the other jurors, and come back and recommend life in prison if you thought that was the appropriate punishment in this case?

> JUROR THORPE: Yes.

> THE COURT: And, on the other hand, if after hearing all the evidence and being instructed by the Court as to the law that you would have to apply to the evidence, deliberating with your fellow jurors, if you thought that death was the appropriate punishment, would you be able to come back and stand there and recommend death in this case for this man?

> JUROR THORPE: I'm going to say no because I just couldn't sentence [anyone] to death. . . .

THE COURT: You personally could not do it?

JUROR THORPE: No.

During a subsequent hearing, defense counsel asked the trial court about its statement that the jurors were required to "stand[] there and say[] death." The trial court then informed defense counsel that the jurors are "required to come in here and stand there and answer the clerk's questions to what their verdict is and if it's death they're required to assent to that here in open court." Defendant contends that the law does not require jurors to stand up and say "death" and that such a requirement would "be a tremendous burden on jurors."

In *State v. White,* 343 N.C. 378, 471 S.E.2d 593, *cert. denied,* ―― U.S. ――, 136 L. Ed. 2d 229 (1996), this Court addressed a similar issue. In *White,* the defendant claimed that the prosecutor improperly asked a prospective juror whether he could, if the State met its burden of proof, "come back into the courtroom, given [his] religious beliefs, and stand up in front of this man and say, 'I sentence you to be executed?'" *Id.* at 386, 471 S.E.2d at 598. This Court did not find an abuse of discretion and stated, "[t]he question, although overstating the juror's actual role in the sentencing process, was fairly aimed at determining the extent of [the juror's] reservations about imposing the death penalty." *Id.* at 387, 471 S.E.2d at 598. Similarly, in the present case, the trial court sought to clarify Thorpe's position on the death penalty because of her equivocal responses concerning the death penalty. We do not find the trial court's question to be an abuse of discretion.

[4] Defendant also claims that the trial court erred by refusing to allow him the opportunity to rehabilitate Thorpe. Defendant relies on *State v. Brogden,* 334 N.C. 39, 430 S.E.2d 905 (1993), as support for this proposition. "In *Brogden* this Court found error where the record clearly showed (i) repeated denials by the trial court of requests to rehabilitate under the mistaken belief that such requests are to be denied as a matter of law and (ii) excusal by the trial court of a prospective juror likely qualified to be seated." *State v. Gibbs,* 335 N.C. 1, 35, 436 S.E.2d 321, 340 (1993), *cert. denied,* 512 U.S. 1246, 129 L. Ed. 2d 881 (1994).

Here, the trial court did not refuse to allow defense counsel the opportunity to rehabilitate because the trial court believed it was required to do so as a matter of law. Further, the trial court found,

among other things, "that [Thorpe's] views concerning the death penalty would prevent or substantially impair the performance of this juror in her duties as a juror in accordance with the instructions and her oath." As this Court has previously stated, "[t]he trial court is charged with supervising the examination of potential jurors and has broad discretion to control the extent and manner of *voir dire*." *White*, 343 N.C. at 387, 471 S.E.2d at 598. A review of the transcript supports the trial court's findings concerning Thorpe's views, and defendant has failed to show that further questioning would have resulted in her rehabilitation.

Because the trial court did not abuse its discretion in its questioning of Thorpe or in its refusal to allow the defense to rehabilitate Thorpe, we hold that defendant has failed to demonstrate error. Accordingly, this assignment of error is without merit.

## IV.

[5] Defendant also contends that the trial court erred in allowing the State's motion *in limine* to exclude evidence of the victim's previous marriage and pregnancy. Defendant argues that the defense sought the introduction of this evidence "to preclude the State from misleading the jury by pretending that the victim was a naive, immature girl." Defendant contends that the trial court erred by excluding this evidence in both the guilt phase and the sentencing proceeding and that this error resulted in a violation of his statutory and constitutional rights.

In the present case, the State made a motion *in limine* to prohibit defense counsel or witnesses from referring to the fact that the sixteen-year-old victim had been previously married and pregnant at some time prior to her murder. The State argued that these facts were irrelevant to the issues presented at trial. The defense objected to the motion and argued the evidence was relevant. The trial court then asked the State to give its reasons for the exclusion of the evidence. The State argued that the fact that the victim was only sixteen and "the fact that she was married and pregnant at such a young age could prejudice her image in the eyes of the jury and it's simply not relevant and . . . I submit it's not admissible under Rule 412."

In ruling on the motion *in limine*, the trial court stated the following:

    At this point the motion *in limine* is allowed. Now, if counsel believe that at any point specific questions need to be asked on

this point or if you have independent evidence for the defense[] which would cause some of this information necessarily to be brought before the jury, I'll be glad to hear you, [and] make a ruling as to whether it's of probative value at the time upon request of the defense. But I'm ordering that the defense not mention this matter in opening statements. Not ask questions tending to state these facts in the questions on cross examination without first clearing the court. That does not mean that you may not do it at any time during the trial, but I'd like a chance to rule on what you propose to do before you do it, please.

As this Court has previously stated, "a motion *in limine* is insufficient to preserve for appeal the question of the admissibility of evidence." *State v. Conaway*, 339 N.C. 487, 521, 453 S.E.2d 824, 845-46, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 153 (1995). "Rulings on these motions . . . are merely preliminary and subject to change during the course of trial, depending upon the actual evidence offered at trial and thus an objection to an order granting or denying the motion 'is insufficient to preserve for appeal the question of the admissibility of the evidence.' " *T&T Dev. Co. v. Southern Nat'l Bank of S.C.*, 125 N.C. App. 600, 602, 481 S.E.2d 347, 348-49 (quoting *Conaway*, 339 N.C. at 521, 453 S.E.2d at 845-46), *disc. rev. denied*, 346 N.C. 185, 486 S.E.2d 219 (1997). "A party objecting to an order granting or denying a motion *in limine*, in order to preserve the evidentiary issue for appeal, is required to object to the evidence at the time it is offered at the trial (where the motion was denied) or attempt to introduce the evidence at the trial (where the motion was granted)." *Id.*

During cross-examination of the victim's mother, Phyllis Cooper, defendant attempted to offer evidence concerning the victim's previous marriage and pregnancy. Defendant requested that the trial court reconsider its motion *in limine* and establish that the victim had been married and become pregnant at some point. The State once again objected to the admission of this evidence and argued, among other things, that the evidence was "totally irrelevant." The trial court then stated that its ruling on the motion *in limine* would remain intact.

On appeal, we must determine whether the trial court was correct in refusing to admit evidence concerning the victim's previous marriage and pregnancy. Generally, all relevant evidence is admissible. N.C.G.S. § 8C-1, Rule 402 (1992). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

**STATE v. HILL**

[347 N.C. 275 (1997)]

probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). We have said that "in a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible." *State v. Collins*, 335 N.C. 729, 735, 440 S.E.2d 559, 562 (1994). This Court has also said that " '[i]t is not required that the evidence bear directly on the question in issue, and it is competent and relevant if it is one of the circumstances surrounding the parties, and necessary to be known to properly understand their conduct or motives, or to weigh the reasonableness. of their contentions.' " *State v. Stanley*, 310 N.C. 353, 365, 312 S.E.2d 482, 490 (1984) (quoting *Bank of Union v. Stack*, 179 N.C. 514, 516, 103 S.E. 6, 7 (1920)).

In *State v. Larry*, 345 N.C. 497, 481 S.E.2d 907, *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 66 U.S.L.W. 3281 (1997), the defendant argued that the trial court erred in allowing the State to present evidence that the decedent was a police officer because the evidence was not relevant and was unfairly prejudicial to the defendant. This Court held that the evidence was relevant and that the trial court did not abuse its discretion by allowing it to come in. This Court stated that "[t]he victim's status as a police officer led him to pursue defendant, which led to defendant shooting him." *Id.* at 520, 481 S.E.2d at 920. Thus, the evidence concerned a circumstance surrounding one of the parties and was "necessary to be known to properly understand their conduct or motives." *Stanley*, 310 N.C. at 365, 312 S.E.2d at 490. Furthermore, the question on appeal in *Larry* was whether the trial court erred in admitting the evidence. In the case *sub judice*, it is whether the trial court should have allowed the evidence to come in.

Here, however, while the fact that the victim had been previously married and pregnant is a circumstance surrounding one of the parties, it is not necessary to properly understand their conduct or motives or to weigh the reasonableness of their contentions. The fact that the victim had been married and pregnant is not relevant to the jury's determination of defendant's guilt in these crimes. Further, there was no evidence that the victim's prior marriage and pregnancy had anything to do with the murder. Defendant's argument that the evidence was relevant to prevent the State "from misleading the jury by pretending that the victim was a naive, immature girl" is without merit. Whether the victim is a naive, immature girl has no bearing on defendant's guilt, and the evidence was properly excluded by the trial court at the guilt phase.

The only other instance involving the disputed evidence occurred during the State's direct examination of SBI Agent Michael East. East testified concerning a statement made to him by David Arnold. During this testimony, East mentioned that, according to the statement, defendant told Arnold that the victim had been married. The prosecutor interrupted East briefly, then he continued with his testimony. Defense counsel never objected to the evidence and never attempted to have the evidence admitted based on East's testimony. Thus, defendant has failed to demonstrate error in the trial court's ruling.

Defendant argues strenuously in his brief that the evidence should have been admitted during the sentencing phase of the trial. However, having reviewed the transcript of the sentencing proceeding, we find no instance where defendant attempted to have this evidence admitted. Accordingly, defendant has once again failed to demonstrate error in the trial court's ruling.

[6] Finally, it is not necessary for us to address defendant's contention that the trial court improperly excluded the evidence under Rule 412 of the North Carolina Rules of Evidence. As this Court has previously noted, it does not matter whether the trial court gave the correct or best reason for excluding the evidence so long as its ruling was correct. *See State v. Austin*, 320 N.C. 276, 290, 357 S.E.2d 641, 650, *cert. denied*, 484 U.S. 916, 98 L. Ed. 2d 224 (1987). Accordingly, this assignment of error is overruled.

## V.

[7] Defendant next contends that the trial court erred in denying his motion for mistrial based on the repeated elicitation of a hearsay statement. Defendant argues that this alleged error resulted in a violation of his constitutional and statutory rights. We do not agree.

During the guilt phase of the trial, the State called Rex Johnson as a witness. While testifying on direct examination, Johnson was asked, "On the night of the 18th, did you ever have a chance to hear a conversation that the defendant [may] have had with anyone?" Johnson replied, "That night he asked his daddy, he said, what'd you carry that damn thing home for" (referring to the victim). Defense counsel objected and moved to strike the testimony. Outside the presence of the jury, defendant argued that he had not received notice of this statement during the discovery process. Upon inquiry by the trial court, the State agreed that it had an obligation to provide defense

counsel with any statement about which it had knowledge, but stated that it did not have knowledge of this statement.

After some discussion, the trial court was able to ascertain that the State was unaware of this statement and, further, that it was actually defendant's father who had informed Johnson of defendant's statement, not defendant. Thus, the statement was inadmissible because it was hearsay. The trial court then appropriately allowed defense counsel's motion to strike. When the jurors returned to the courtroom, the trial court instructed them to strike the statement "from [their] mind[s] and memor[ies]" and informed them that the statement was not admissible for any purpose at this point in the trial. The State then proceeded with its questioning of Johnson.

Eventually, Johnson was once again asked, "Did you, yourself, ever hear any statements from the defendant on that night?" Johnson replied, "Nothing. Only he asked his daddy what did you carry her home for." Defense counsel again objected and moved to strike the testimony. Outside the presence of the jury, the trial court explained the following to the witness:

> THE COURT: Okay. Let me make this clear to you, sir. When they ask you a question, you need to listen to the question and answer the question. They didn't ask you what you may have heard the father say. They asked you what, if anything else, you heard the defendant say. And if you didn't hear him say those words, then you shouldn't have said that, you understand?

The witness indicated that he understood, and the trial court subsequently denied defense counsel's motion for mistrial and motion to strike all of the witness' testimony. The trial court further found that the witness did not understand the question and that he did not hear the defendant say, "what'd you carry that damn thing home for." The trial court once again instructed the jury as follows:

> THE COURT: All right. Ladies and gentlemen, again, I repeat the earlier instruction I gave you that this statement is not admissible. This witness did not hear the defendant make any such statement. It is therefore hearsay, it's inadmissible, you are to strike it completely from your minds and memory, not consider it for any purpose at all or relate it to this trial. The State may proceed.

The trial court is required to declare a mistrial upon a defendant's motion "if there occurs during the trial . . . conduct inside or outside

the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." N.C.G.S. § 15A-1061 (1988). It is within the trial court's discretion to determine whether to grant a mistrial, and the trial court's decision is to be given great deference because the trial court is in the best position to determine whether the degree of influence on the jury was irreparable. *State v. Williamson*, 333 N.C. 128, 423 S.E.2d 766 (1992).

A review of the record reveals that the witness' testimony concerning the hearsay statement was inadvertent. This isolated instance hardly represents prosecutorial misconduct as defendant contends. The record makes clear that the witness was confused concerning what he could testify to and that the trial court attempted to rectify the situation. Even had the improper testimony been prejudicial, the trial court's curative instructions ordinarily would have dispelled any prejudice. *See State v. Rowsey*, 343 N.C. 603, 627, 472 S.E.2d 903, 916 (1996), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 221 (1997). "Jurors are presumed to follow the court's instructions when they are told not to consider testimony." *State v. Cox*, 344 N.C. 184, 189, 472 S.E.2d 760, 763 (1996).

Here, the inadvertent hearsay statement did not result in substantial and irreparable prejudice to defendant's case. Accordingly, the trial court did not err by refusing to grant defendant's motion for a mistrial. This assignment of error is overruled.

## VI.

[8] Next, defendant assigns as error the trial court's failure to grant a mistrial based on alleged prosecutorial misconduct during closing arguments in both the guilt and sentencing phases of the trial. Defendant argues that the trial court's failure to grant a mistrial violated both his statutory and constitutional rights. Because defendant made no motion for a mistrial based on closing arguments, we must determine whether the trial court erred by failing to grant a mistrial *ex mero motu*.

As noted previously, it is within the trial court's discretion to determine whether to grant a mistrial, and the trial court's decision is to be given great deference because the trial court is in the best position to determine whether the degree of influence on the jury was irreparable. *Williamson*, 333 N.C. 128, 423 S.E.2d 766. This is particularly true where, as here, defendant did not move for a mistrial at either phase of the trial as a result of allegedly improper closing arguments.

Generally, counsel is allowed wide latitude in the scope of jury arguments. *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487 (1992). Counsel is permitted to argue the facts which have been presented, as well as reasonable inferences which can be drawn therefrom. *State v. Williams*, 317 N.C. 474, 346 S.E.2d 405 (1986). N.C.G.S. § 15A-1230 limits closing arguments by prohibiting an attorney from "inject[ing] his personal experiences, express[ing] his personal belief . . . , or mak[ing] arguments on the basis of matters outside the record." N.C.G.S. § 15A-1230 (1988).

Based on the principles set out above, we will address defendant's contentions accordingly. First, defendant complains of a statement made by the prosecutor during his closing argument at the guilt phase of the trial, to which no objection was made. The prosecutor's remark was as follows: "As I stated in my opening statement, this may be the most atrocious crime that has occurred here in Harnett County." Defendant argues that this statement amounts to "prosecutorial expertise" and should not have been allowed. However, this Court has held that hyperbolic language is acceptable in jury argument so long as it is not inflammatory or grossly improper. *See Frye*, 341 N.C. at 499, 461 S.E.2d at 679. Similar language has been allowed by this Court in previous cases. *See, e.g., State v. Elliott*, 344 N.C. 242, 281-82, 475 S.E.2d 202, 220-21 (1996) (prosecutor's statement that the killing was the "worst of the worst" allowed), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 312 (1997); *State v. Fullwood*, 343 N.C. 725, 739-41, 472 S.E.2d 883, 890-91 (1996) (prosecutor's comment that the murder being tried was one of the worst in the sixty-year history of the Buncombe County courthouse allowed), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 339 (1997). Thus, the trial court did not err by failing to grant a mistrial *ex mero motu*.

Defendant further assigns as error the prosecutor's argument during the sentencing proceeding that "this is probably one of the most atrocious crimes that has occurred here in Harnett County." Defendant did object to this argument. However, as noted above, this Court has upheld similar statements by prosecutors, and defendant has again failed to show that the trial court erred by failing to grant a mistrial *ex mero motu*.

[9] Next, defendant assigns as error the prosecutor's argument that even if someone else was with defendant and that defendant was an accomplice, defendant is nevertheless guilty of the charged offenses because "two people acting together can commit a crime. I think you

understand that." Defendant argues that because the State had previously declined to rely on an acting-in-concert theory, the prosecutor should not have referenced it in his closing argument. However, the remark was made in a nontechnical way that required no understanding about the law of acting in concert or aiding and abetting. When viewed contextually, the argument merely reflected that even if someone else were present at the crime scene, it does not absolve defendant of his own actions. Once again, defendant did not object to this argument at trial, and we fail to see how the trial court committed error in failing to declare a mistrial based on this remark.

[10] Defendant also points to several statements made by the prosecutor during the sentencing phase of the trial to which he did not object. Defendant specifically assigns as error the following: (1) the fact that the State routinely referred to the victim, Angie Godwin, as Angie Porter, her maiden name; (2) the prosecutor's argument that the victim's being shot in the head multiple times at point-blank range rendered this killing especially heinous, atrocious, or cruel; (3) the prosecutor's argument that the brutality here exceeded that normally present in any killing; (4) the characterization of mitigating circumstances as excuses; and (5) the prosecutor's argument that defendant bore the burden of proving the mitigating circumstances, even though the State had already stipulated to the existence of one of the statutory mitigating circumstances. After reviewing the prosecutor's arguments contextually, we conclude that none of them were so grossly improper as to require the trial court to intervene *ex mero motu* or to declare a mistrial.

[11] Finally, defendant argues that the prosecutor impugned the character of an expert witness who testified on behalf of the defense, arguing to jurors that many of the submitted mitigating circumstances "were developed skillfully by the defense experts who go around this State testifying for defendants in capital cases, selling their services and opinions at rates from $75 to $125 an hour." Defendant's objections to this argument were overruled. Defendant argues that this was an improper and fallacious statement. Therefore, defendant contends the trial court should have intervened and declared a mistrial *ex mero motu*.

In *State v. Spruill*, 338 N.C. 612, 452 S.E.2d 279 (1994), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 63 (1995), the prosecutor made a similar argument to the jury. This Court, while assuming the prosecutor's statements were improper, determined that the argument did

not entail such error as to entitle the defendant to a new sentencing proceeding. *Id.* at 651-52, 452 S.E.2d at 300-01. Similarly, here, assuming *arguendo* that the prosecutor's statements were improper, they do not entitle defendant to a new sentencing proceeding. Thus, the trial court did not err by failing to grant a mistrial *ex mero motu.*

We have carefully reviewed the record, and although we disapprove of one of the statements made by the prosecutor, we fail to see how that statement alone resulted in denying defendant his right to a fair trial. Accordingly, we do not believe that the trial court abused its discretion in failing to declare a mistrial *ex mero motu* based on the prosecutor's closing arguments. This assignment of error is without merit.

## VII.

**[12]** Defendant also assigns as error the trial court's refusal to submit two statutory mitigating circumstances. Specifically, defendant contends that the trial court erred by refusing to submit the statutory mitigating circumstance that defendant committed the murder while under the influence of a mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2) (Supp. 1996), and the statutory mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6). Defendant argues that substantial evidence was introduced during the sentencing proceeding to support the statutory mitigating circumstances requested and that the trial court's refusal to submit them violated his statutory and constitutional rights.

"A trial court must submit only those mitigating circumstances which are supported by substantial evidence." *State v. Strickland,* 346 N.C. 443, 463, 488 S.E.2d 194, 206 (1997). Further, defendant bears the burden of producing "substantial evidence" tending to show the existence of a mitigating circumstance before that circumstance will be submitted. *State v. Rouse,* 339 N.C. 59, 100, 451 S.E.2d 543, 566 (1994), *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 60 (1995). In *State v. Earnhardt,* 307 N.C. 62, 296 S.E.2d 649 (1982), this Court discussed the principles involved in determining what constitutes "substantial evidence" and stated:

> The issue of whether the evidence presented constitutes substantial evidence is a question of law for the court. *State v. Stephens,* 244 N.C. 380, 384, 93 S.E.2d 431, 433 (1956). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith,* 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The terms "more than a scintilla of evidence" and "substantial evidence" are in reality the same and simply mean that the evidence must be existing and real, not just seeming or imaginary. *State v. Powell,* 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980).

*Earnhardt,* 307 N.C. at 66, 296 S.E.2d at 652.

First, we must determine whether substantial evidence existed to support the submission of the statutory mitigating circumstance that the murder was committed while defendant was under the influence of a mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2). A defendant's mental or emotional disturbance does not warrant submission of the (f)(2) circumstance unless the disturbance existed at the time of the murder. *State v. McKoy,* 323 N.C. 1, 28-29, 372 S.E.2d 12, 27 (1988), *sentence vacated on other grounds,* 494 U.S. 433, 108 L. Ed. 2d 369 (1990).

Defendant contends that the evidence presented in *State v. Stokes,* 308 N.C. 634, 304 S.E.2d 184 (1983), is comparable to the evidence presented in the present case. In *Stokes,* the defendant presented evidence indicating that he had an IQ of 63 and a long history of psychiatric treatment for mental disorders. *Id.* at 654, 304 S.E.2d at 196. Further, the defendant in *Stokes* had been diagnosed as having an antisocial personality disorder and as being mildly mentally retarded. *Id.* This Court held that the evidence was sufficient to warrant submission of the (f)(2) mitigating circumstance. *Id.* at 655, 304 S.E.2d at 196.

Here, however, we do not believe the evidence was sufficient to require the trial court to submit the (f)(2) mitigating circumstance. Testimony indicated that defendant's verbal IQ was 78, while his performance IQ was 90. Thus, defendant's IQ was within the low average range. Dr. Claudia Coleman, a clinical forensic psychologist testifying for the defense, concluded that the primary personality characteristics exhibited by defendant were emotional and social alienation. Dr. Coleman further stated that she found no evidence of psychosis in defendant. She did state that defendant appeared to suffer from mild depression, but she stated that part of the depression could be the result of defendant's recent incarceration.

Further, the testimony given by defendant's expert witnesses did not provide a nexus between defendant's personality characteristics

and the crimes he committed. Indeed, the manner of the killing and defendant's subsequent actions indicate that he was not under the influence of a mental or emotional disturbance at the time of the killing. The evidence showed that defendant raped the victim and deliberately set her body on fire in order to destroy the evidence. Defendant also returned to the house where he had attacked the victim and set the house on fire. Subsequently, defendant drove to a pond, where he threw the gun used in the murder into the water. "The events before, during, and after the killing suggested deliberation, not the frenzied behavior of an emotionally disturbed person." *State v. Noland*, 312 N.C. 1, 23, 320 S.E.2d 642, 655-56 (1984). Accordingly, the trial court did not err in refusing to submit the (f)(2) circumstance.

[13] Next, we must determine whether the trial court erred in refusing to submit the (f)(6) statutory mitigating circumstance. Defendant contends that poor impulse control and subaverage intelligence established that his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. In discussing the (f)(6) statutory mitigating circumstance, this Court has noted that

> this circumstance has only been found to be supported in cases where there was evidence, expert or lay, of some mental disorder, disease, or defect, or voluntary intoxication by alcohol or narcotic drugs, to the degree that it affected the defendant's ability to understand and control his actions.

*Syriani*, 333 N.C. at 395, 428 S.E.2d at 142-43.

Although expert testimony was presented in the present case, the testimony did not establish that defendant's personality characteristics affected his ability to understand and control his actions. In fact, both of defendant's expert witnesses testified to the contrary. The prosecutor asked Mr. Dennis, defendant's expert in the field of social work, "based upon your own observations and conversations with this defendant, [he] clearly understands the difference between right and wrong, [doesn't] he?" to which Mr. Dennis replied, "Certainly." Further, Dr. Coleman, defendant's expert in the field of clinical forensic psychology, testified on cross-examination as follows:

> Q. And, Dr. Coleman, you also would agree, would you not, that the defendant has the capacity to distinguish between right and wrong?

A. I think that he certainly knows what's legal and illegal.

. . . .

Q. Well, Doctor, the defendant certainly has the capacity to understand that killing another human being is wrong, does he not?

A. He understands it's illegal and that society considers it wrong, yes, sir.

Q. Well, does he not also understand himself that it's wrong?

A. I think that he does. I have seen remorse in this past year or last year when I saw him, over the period, yes, I think he believes that it's wrong.

Q. And would you not also agree that the defendant has the capacity to understand that rape is wrong?

A. Yes, sir.

Q. Would you not also agree that he has the capacity to understand that sodomizing another person without that person's consent is wrong?

A. Yes, sir.

This testimony clearly demonstrates that the trial court did not err by refusing to submit the (f)(6) statutory mitigating circumstance. Defendant's experts not only testified that defendant had the ability to understand right from wrong, but also testified that defendant had the capacity to understand that killing another human being is illegal. Further, there was no testimony or evidence suggesting that at the time of the murder, defendant's capacity to understand right from wrong or to conform his conduct to the requirements of the law was impaired as required by the (f)(6) mitigator. Accordingly, the trial court did not err by refusing to submit this mitigating circumstance to the jury.

## VIII.

[14] In defendant's next assignment of error, he contends that the trial court erred by failing to direct a verdict on the statutory mitigating circumstance that defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1). Defendant argues that this omission resulted in a violation of his constitutional rights.

STATE v. HILL

[347 N.C. 275 (1997)]

During the sentencing proceeding, defendant sought submission of the statutory mitigating circumstance that the defendant has no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1). After some discussion, the State eventually agreed to stipulate to the fact that defendant had no significant history of prior criminal activity. Defendant contends the trial court's failure to require the jurors to find and consider the statutory mitigating circumstance entitles him to a new capital sentencing proceeding. We disagree.

Because defendant did not object to the form of the instruction at trial, defendant must show plain error. "[T]he term 'plain error' does not simply mean obvious or apparent error." *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). "In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury [probably] would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected." *State v. White*, 340 N.C. 264, 299, 457 S.E.2d 841, 862, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 436 (1995).

The effect of the stipulation was to "remov[e] a question of fact from the jury's consideration. . . . Because both parties stipulated to the existence of the statutory mitigating circumstance, whether defendant had a significant history of prior criminal activity was not a factual matter for the jury to determine." *State v. Flippen*, 344 N.C. 689, 701, 477 S.E.2d 158, 165 (1996). Here, the trial court instructed the jury on the (f)(1) mitigating circumstance as follows:

First, consider whether the defendant has no significant history of prior criminal activity before the date of the murder. All of the evidence, ladies and gentlemen, shows the defendant has no significant history of prior criminal activity. It has been stipulated by the State that the defendant has no criminal convictions and that there is no significant history of prior criminal activity by the defendant. Therefore, as to this mitigating circumstance you will have your foreman write yes in the space provided after this mitigating circumstance on the Issues and Recommendation form.

Subsequently, after instructing on all the mitigating circumstances submitted, the trial court further instructed:

Let me remind you, ladies and gentlemen, that as to mitigating circumstance No. 1, the defendant has no significant history of prior criminal activity, I have directed that you will answer that

issue, yes. And because you answer that issue, yes, you must find that there is at least that one [mitigating circumstance]. Of course you may certainly find other mitigating circumstances . . . [b]ut because you must answer that issue yes, then you must answer Issue No. 2, yes.

Thus, the trial court directed the jurors to answer affirmatively as to the mitigating circumstance that defendant has no significant history of prior criminal activity and further stated that they were required to find the existence of at least one mitigating circumstance in Issue Two. The jurors must, therefore, under proper instructions, weigh this mitigating circumstance in Issue Three. Unlike in *Flippen*, relied on by defendant, these instructions did not allow the jury to answer "no" to the existence of the statutory (f)(1) mitigator.

We note that the trial court in the present case did not completely eliminate all remarks that might allow the jurors discretion in finding the (f)(1) mitigating circumstance. For example, the trial court stated, "Now, in the event you do not find the existence of any mitigating circumstances, you would still answer this issue." However, the trial court thereafter stated, "[A]s I have instructed you, because you will find at least one mitigating circumstance in this case, you must answer this issue." As this Court has previously stated, "If the charge as a whole presents the law fairly and clearly to the jury, the fact that isolated expressions, standing alone, might be considered erroneous will afford no ground for a reversal." *State v. Terry*, 337 N.C. 615, 623, 447 S.E.2d 720, 724 (1994).

We conclude that the trial court, in fact, directed a verdict on this circumstance and that defendant has failed to show any error, much less plain error, in the trial court's instructions regarding the (f)(1) statutory mitigating circumstance. Accordingly, this assignment of error is without merit.

## PRESERVATION ISSUES

Defendant raises three additional issues which he concedes have been decided contrary to his position previously by this Court: (1) the trial court erred in instructing the jury on the statutory aggravating circumstance that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9), in violation of the United States Constitution; (2) the trial court erred in requiring jurors to find that nonstatutory mitigating circumstances had mitigating value before considering the evidence offered in support of the mitigating circum-

stances, in violation of both the North Carolina and the United States Constitutions; and (3) the trial court erred in instructing that each juror was allowed, rather than required, to consider mitigating circumstances he or she found at Issue Two when weighing the aggravating circumstances against the mitigating circumstances, in violation of both the North Carolina and the United States Constitutions.

Defendant raises these issues for purposes of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for any possible further judicial review. We have considered defendant's argument on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[15] Having found no error in either the guilt or sentencing phase, we must determine whether: (1) the evidence supports the aggravating circumstances found by the jury; (2) passion, prejudice, or any other arbitrary factor influenced the imposition of the death sentence; and (3) the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of first-degree murder on the basis of malice, premeditation, and deliberation and also under the felony murder rule. The jury found the aggravating circumstances that the murder was committed while defendant was engaged in the commission of arson, N.C.G.S. § 15A-2000(e)(5); that the murder was committed while defendant was engaged in the commission of rape, N.C.G.S. § 15A-2000(e)(5); that the murder was committed while defendant was engaged in the commission of a sexual offense, N.C.G.S. § 15A-2000(e)(5); and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). We conclude that the evidence supports each aggravating circumstance found. We further conclude, based on a thorough review of the record, that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Thus, the final statutory duty of this Court is to conduct a proportionality review.

Proportionality review is designed to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In conducting

proportionality review, we determine whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983); *accord* N.C.G.S. § 15A-2000(d)(2). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *Green*, 336 N.C. at 198, 443 S.E.2d at 47.

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 433 S.E.2d 144 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). It is also proper for this Court to compare this case with the cases in which we have found the death penalty to be proportionate. *Id.* Although we review all of these cases when engaging in this statutory duty, we will not undertake to discuss or cite all of those cases each time we carry out that duty. *Id.*

This Court has determined that the sentence of death was disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 66 U.S.L.W. 3262 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

However, we find the present case distinguishable from each of these seven cases. In three of those cases, *Benson*, 323 N.C. 318, 372 S.E.2d 517; *Stokes*, 319 N.C. 1, 352 S.E.2d 653; and *Jackson*, 309 N.C. 26, 305 S.E.2d 703, the defendant either pled guilty or was convicted by the jury solely under the theory of felony murder. Here, defendant was convicted on the theory of malice, premeditation, and deliberation and also under the felony murder rule. We have said that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

Further, of the cases in which this Court has found the death penalty disproportionate, only two involved the especially heinous,

atrocious, or cruel aggravating circumstance. *Stokes*, 319 N.C. 1, 352 S.E.2d 653; *Bondurant*, 309 N.C. 674, 309 S.E.2d 170. Neither *Stokes* nor *Bondurant* is similar to this case. In *Stokes*, the defendant was convicted under a theory of felony murder, and there was virtually no evidence of premeditation and deliberation. As noted above, in the present case, defendant was convicted upon a theory of premeditation and deliberation as well as under the felony murder rule. Further, in *Stokes*, the victim was killed at his place of business. In the present case, the victim was killed in what was the equivalent of her home—her father's home. A murder in one's home "shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure." *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

*Bondurant* is also distinguishable from the present case. In *Bondurant*, the defendant exhibited remorse and concern for the victim's life by immediately seeking medical help for the victim. In the present case, by contrast, after shooting the victim in the head several times, defendant set the victim's body on fire in an attempt to cover up the crime and insure the victim's death.

Finally, the sexual assault of the sixteen-year-old victim as well as the mutilation of her body render this murder particularly dehumanizing. This Court has often found a death sentence proportionate where the defendant sexually assaulted the victim of first-degree murder. *See State v. Perkins*, 345 N.C. 254, 290, 481 S.E.2d 25, 42, *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 66 U.S.L.W. 3256 (1997); *State v. Payne*, 337 N.C. 505, 537, 448 S.E.2d 93, 112 (1994), *cert. denied*, 514 U.S. 1038, 131 L. Ed. 2d 292 (1995); *State v. Lee*, 335 N.C. 244, 294, 439 S.E.2d 547, 574, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994).

We recognize that juries may have imposed sentences of life imprisonment in cases which are similar to the present case. However, this fact "does not automatically establish that juries have 'consistently' returned life sentences in factually similar cases." *Green*, 336 N.C. at 198, 443 S.E.2d at 47. This Court has long rejected a mechanical or empirical approach to comparing cases that are superficially similar. *State v. Robinson*, 336 N.C. 78, 139, 443 S.E.2d 306, 337 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995).

After reviewing the cases, we conclude that the present case is more similar to certain cases in which we have found the sentence of

death proportionate than to those in which we have found the sentence of death disproportionate or those in which juries have consistently returned recommendations of life imprisonment.

Based on the nature of this crime, and particularly the distinguishing features noted above, we cannot conclude as a matter of law that the sentence of death was excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error.

NO ERROR.